IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Weiand Automotive Industries, et al., | : | Case No.: 09-13338 (CSS) |
| | : | |
| Reorganized Debtors. | : | |
| | : | |

## OPINION[1]

**PEPPER HAMILTON LLP**
David B. Stratton
Evelyn J. Meltzer
Douglas D. Hermann
John H. Schanne, II
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19809-1709

Counsel for the Reorganized Debtors

Date: February 25, 2020

Sontchi, C.J. _____

**SULLIVAN HAZELTINE
ALLINSON LLC**
William D. Sullivan
William A. Hazeltine
901 North Market Street
Suite 1300
Wilmington, DE 19801

Counsel for the Mehrabian Family
Trust and CA Auto Mart Group, Inc.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION[2]

Before the Court is the *Motion of Reorganized Debtors for Summary Judgment on the Claim Discharge Dispute* and the *Cross Motion of the Mehrabian Family Trust and CA Auto Mart Group, Inc. for Summary Judgment on the Claim Discharge Dispute*.[3]  By these motions, the parties seek declaratory judgment regarding the applicability of the discharge and injunction provisions of the Plan and Confirmation Order (the "Discharge Injunction") to the Plaintiffs' environmental claims against the Reorganized Debtors.  The Defendants argue that the Plaintiffs claims are discharged by the Confirmation Order because: (i) the Plaintiffs' claims arose prior to the petition date, and (ii) the Plaintiffs lack standing to assert their claims based on an alleged breach of the Reorganized Debtors' Voluntary Cleanup Agreement.  Conversely, the Plaintiffs maintain that the Confirmation Order does not discharge their environmental claims because: (i) their claims did not arise until after the Court confirmed the Reorganized Debtors' Plan of Reorganization, and (ii) the Plaintiffs did not receive constitutionally adequate notice of the Reorganized Debtors' bankruptcy proceedings.

Also before the Court is the *Motion of the California Action Plaintiffs for Summary Judgment on the Insured Claims.*  In this motion, the Plaintiffs seek declaratory judgment concerning whether the Discharge Injunction bars the Plaintiffs from establishing liability

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them *infra*.

[3] The Mehrabian Family Trust and CA Auto Mart Group, Inc. (collectively, the Plaintiffs) also filed pleadings collectively referring to themselves as the "California Action Plaintiffs."  Hereinafter, the Court will refer to them as "Plaintiffs."  For clarity, "Plaintiffs" are Mehrabian Family Trust and CA Auto Mart Group, Inc. and/or the California Action Plaintiffs.

through the California Action in order to collect judgment from the Reorganized Debtors' insurers.

For the reasons stated below, the Court finds that neither the Reorganized Debtors nor the Plaintiffs are entitled to summary judgment on the Claim Discharge Dispute. There is a genuine dispute of material fact concerning when the California Action claims arose. Additionally, the record is insufficient to determine if the Plaintiffs were known creditors of the Debtors or if the Debtors' publication notice was adequate. Furthermore, because the Plaintiffs never asserted the arguments in their briefs, the Court will not decide if the Plaintiffs lack standing to assert their claims pursuant to the Reorganized Debtors' alleged breach of the Voluntary Cleanup Agreement.

Finally, the Court will grant the Plaintiffs' motion for summary judgment on the Insured Claims Dispute. This Court has core jurisdiction over the Insured Claims Dispute, which falls within the scope of authority defined by the California District Court. Section 524 does not prohibit recovery from a non-debtor third-party that is liable for the debt of a debtor.

## JURISDICTION & VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(I)-(J). Venue is proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409. The Court has the judicial authority to enter a final order.

**BACKGROUND**

I.    **Procedural History**

Relevant procedural background spans more than one decade.    On September 28, 2009 (the "Petition Date"), Weiand Automotive Industries, Inc. ("Weiand"), Holley Performance Products Inc, ("Holley") and their affiliates (collectively, the "Debtors", and post-confirmation, the "Reorganized Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court or the "Bankruptcy Court") for relief under Chapter 11 of the Bankruptcy Code (the "Weiand Bankruptcy" or the "Bankruptcy").[4]    On December 2, 2009, the Delaware Bankruptcy Court  entered a bar date order establishing February 1, 2010 as the general bar date for all creditors holding a claim (the "General Bar Date" or the "Bar Date").[5]  On June 7, 2010, the Delaware Bankruptcy Court entered an order confirming the *Debtors' Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Plan") which entered effect on June 22, 2010 (the "Confirmation Order").[6]  The case was closed on February 27, 2012.[7]

On March 20, 2015, the Plaintiffs filed a complaint in the United States District Court for the Central District of California (the "California District Court" or the

---

[4] Del. Bankr. 09-13333, D.I. 1. Debtors in these Chapter 11 cases are as follows: Weiand Automotive Industries, Inc., Holley Performance Products Inc., Holley Performance Products Holdings, Inc., Holley Performance Systems. Inc., and Nitrous Oxide Systems, Inc.  In 2013, the Weiand Automotive Industries, Inc. and Nitrous Oxide Systems, Inc. merged with and into Holley Performance Products Inc.

[5] Del. Bankr. 09-13333, D.I. 195.

[6] Del. Bankr. 09-13333, D.I. 534.

[7] Del. Bankr. 09-13333, D.I. 770.

"California Court") against Joan F. Weiand, Joan F. Weiand Trust, and the Reorganized Debtor, Weiand Automotive (the "California Action").[8]   In the California Action the Plaintiffs seek, among other things, to recover past, present, and future environmental clean-up costs associated with the surface and sub-surface contamination and migration of hazardous waste on properties owned and leased  by the Plaintiffs.  The California Action asserts claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and California state law.  On July 2, 2015, Holley Performance Products, Inc. filed a motion to dismiss the California Action on grounds which included that the Plaintiffs' claims were barred both by the Delaware Bankruptcy Court's discharge order in the Weiand Bankruptcy and by a 2001 settlement order issued by the California District Court in connection with a previous contamination cleanup cost lawsuit by Union Pacific Railroad Company.[9]   This motion was granted in some respects but denied with respect to the Weiand Bankruptcy discharge order and the Union Pacific Railroad Company settlement order.[10]

On July 2, 2015 the Reorganized Debtors filed a motion in the Bankruptcy Court to reopen the Bankruptcy to determine if the Bar Date Order and the discharge and injunction provisions in the Plan and Confirmation Order applied to the California Action claims (the "Claim Discharge Dispute").[11]   The Court denied this motion without

---

[8] C.D. Cal. 15-02105, D.I. 1.

[9] C.D. Cal 15-02105, D.I. 39-40.

[10] C.D. Cal 15-02105, D.I. 54.

[11] Del. Bankr. 09-13333, D.I. 778.

prejudice in the event that the California District Court would prefer the Delaware Bankruptcy Court determine whether Discharge Injunction was applicable to the claims asserted in the California Action.[12]  On September 21, 2015, the California District Court stayed the California Action pending mediation between the Reorganized Debtors and the Plaintiffs (collectively, the "Parties"), which after approximately one year was unsuccessful.[13]  The California Action remains stayed.

On January 19, 2017, the California District Court entered the *Order re: Resolution of Discharge Issue by Bankruptcy Court*, which held that this Court should resolve the Claim Discharge Dispute.[14]  On April 5, 2017, the Reorganized Debtors filed a Motion with this Court to reopen the Bankruptcy for the limited purpose of adjudicating the Claim Discharge Dispute.[15]  This motion was granted on April 6, 2017.[16]

On April 12, 2019, the Reorganized Debtors filed the *Motion of Reorganized Debtors for Summary Judgment on the Claim Discharge Dispute*,[17] and on May 31, 2019, the Plaintiffs filed their *Cross Motion for the California Plaintiffs for Summary Judgement on the Claim*

---

[12] Del. Bankr. 09-13333, D.I. 790.

[13] C.D. Cal 15-02105, D.I. 58.

[14] C.D. Cal 15-02105, D.I. 70.

[15] Del. Bankr. No. 09-13338, D.I. 7.  All references to this case will be cited hereinafter as "D.I." along with the appropriate docket index number unless otherwise stated.

[16] D.I. 9.

[17] D.I. 90.  This motion was filed together with the *Opening Brief in Support of Reorganized Debtors' for Summary Judgment on the Claim Discharge Dispute* (D.I. 91), the *Declaration of Steve M. Trussell in Support of Motion of Reorganized Debtors for Summary Judgment on the Claim Discharge Dispute* (D.I. 92), and the *Transmittal Affidavit of Douglas D. Herrmann in Support of Reorganized Debtors' Motion for Summary Judgment on the Claim Discharge Dispute* (D.I. 93), collectively (the "Claim Discharge Motion").

*Discharge Dispute.*[18]    Additionally, on May 17, 2019 the Plaintiffs filed their *Motion of*
*California Action Plaintiffs for Summary Judgment on the Insured Claims*, which seeks,
irrespective of the ruling on the  Claim Discharge Dispute, a judgment that would permit
the Plaintiffs to establish Weiand's liability in the California Action and to collect
judgment from Weiand's insurers.[19]  On June 26, 2019 the Reorganized Debtors filed the
*Answering Brief of Reorganized Debtors in Opposition to Motion of California Action Plaintiffs*
*for Summary Judgment on the Insured Claims*.[20]  The Plaintiffs filed a *Reply Brief in Support*
*of Motion of California Action Plaintiffs for Summary Judgment on the Insured Claims* on July
10, 2019.[21]  On July 3, 2019, the Reorganized Debtors filed a *Request for Oral Argument on*
*Motion of Reorganized Debtors for Summary Judgment on the Claim Discharge Dispute.*[22]  On
July 11, 2019 the Plaintiffs filed a *Request for Oral Argument* on: (i) the Reorganized
Debtors' Claim Discharge Motion; (ii) the Plaintiffs' Claim Discharge Cross Motion; and
(iii) the Plaintiffs' Insured Claims Motion.[23]    The Court heard oral argument on
January 27, 2020.

---

[18] D.I. 108.  This motion was filed together with the *Joint Brief in Opposition to the Motion of Reorganized Debtors for Summary Judgement and in Support of the Cross Motion of the Mehrabian Family Trust and CA Auto Mart Group Inc. for Summary Judgment on the Claim Discharge Dispute* (D.I. 109), collectively (the "Claim Discharge Cross Motion").

[19] D.I. 104.  This motion was filed together with the *Opening Brief in Support of Motion of California Action Plaintiffs for Summary Judgment on the Insured Claims* (D.I. 105), and the *Declaration of William Sullivan in Support of Motion for Summary Judgment* (D.I. 106), collectively (the "Insured Claims Motion").

[20] D.I. 112.

[21] D.I. 119.

[22] D.I. 116.

[23] D.I. 120.

II.    **Factual Background**

All of the Parties own or lease property in the San Fernando Valley, which is the location of significant environmental contamination.  Due to the valley's commercial and industrial past, Tetrachloroethene ("PCE") and trichloroethylene ("TCE"), two volatile organic compounds ("VOCs"), are prevalent in the region and central to the contamination claimed in this case.  PCE and TCE are carcinogens and have been associated with neurological and organ damage.[24]

In 1972, Joan F. Weiand and her husband purchased a 1.6-acre property (the "Site"), to operate the Weiand Automotive machine shop, which used PCE in the course of it business activities.[25]  In 1998, Holley Performance Products acquired Weiand, and, shortly thereafter, ceased operations at the Site when it relocated to Kentucky.  Joan F. Weiand was the owner of the Site at the time Weiand Automotive released PCE and other VOCs on to neighboring properties.

The Mehrabian Family Trust owns property at 2216, 2232, 2242, 2244, and 2250 N. Fernando Road in Los Angeles, California (the "Mehrabian Property" or "MFT Property").  Like most properties in this area, the property has a history of significant industrial use.  The Plaintiffs have operated a car dealership on the MFT Property since 2000.  As part of the car dealership business, the Plaintiffs leased a portion

---

[24] D.I. 91, Exh. 3 at 4.  Weiand Automotive used PCE in its operations from 1975 until 1986.  In 1991, Joan Weiand ceded ownership to the Weiand Family Trust.

[25] D.I. 91. Exh. 3 at 4.

of the Site from the Weiand Trust from 2002 to 2014.[26] The MFT Property and the leased property are the subject of the California Action; these properties allegedly sustained damage when PCE and other hazardous materials contaminated the Site and migrated south to the MFT Property.

The Plaintiffs have made frequent attempts to buy the Site from the Reorganized Debtors. In 2005, the Plaintiffs appraised the Site for the purposes of making a purchase offer to the Reorganized Debtors. This study indicated that the Site was contaminated.[27] Subsequently, in November 2008, as a condition to refinancing, the Plaintiffs engaged a bank that conducted a Phase I investigation of the Site, which noted that the MFT Property could face contamination risk from the Site.[28] In June 2014, the Plaintiffs conducted diligence on the Site and adjacent areas and found PCE under the MFT property.[29] Consequently, in March 2015, the Plaintiffs filed suit against the Reorganized Debtors in the California District Court.

In addition to the Site, a number of neighboring properties have been the subject of significant environmental investigations. Among them is Taylor Yard, which is a 244-acre former Union Pacific railyard that is situated adjacent to Weiand Automotive, the MFT property, and the LA Bureau of Sanitation (formerly Profile Plastics). The property was known to contain significant amounts of hazardous waste given the property's long

---

[26] D.I. 91 at 13.

[27] D.I. 93, Exh. 11 at 8.

[28] D.I. 91 at 23.

[29] D.I. 110, Exh. 21 at 7.

history of industrial operations that began in the 1890s. In the 1990s, the Taylor Yard remediation was overseen by the Department of Toxic Substances Control ("DTSC").[30] All neighboring property owners, including the Plaintiffs, were placed on a mailing list that apprised them of the status of remediation.[31]

In May 1999, Union Pacific Railroad filed suit against Profile Plastics and Weiand Automotive for the migration of hazardous waste from these properties to Parcel F, a section of Taylor Yard. It did not sue the Plaintiffs. In August 2000, Weiand filed but never served a third-party complaint against the Plaintiffs, the owners of the MFT Property. Prior to service, Weiand and Union Pacific reached a settlement related to the Taylor Yard cleanup. A copy of the settlement order was sent to the Plaintiffs.[32] As one of the conditions of settlement, in July 2001, Weiand and Joan Weiand entered into a Voluntary Cleanup Agreement ("VCA") with the DTSC to investigate and remediate the Site. Remediation efforts were conducted from 2005-2009, and a "no further action letter" was issued by the DTSC in September 2016. Presently, Parcel F has been acquired and renovated by the Los Angeles Unified School District ("LAUSD"). In 2008, the LAUSD investigated and remediated the property.[33] Today, Parcel F houses the Sonia Sotomayor School.

---

[30] D.I. 91 at 20.

[31] D.I. 91 at 24.

[32] D.I. 91 at 24.

[33] D.I. 91 at 25.

Additionally, Profile Plastics operated adjacent to the MFT Property from 1975 to 1992.  Due to the property's industrial past, the land was remediated from 2003 to 2015.[34]

On September 28, 2009 the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On December 2, 2009, the Court established the February 1, 2010 General Bar Date.  The Plaintiffs were not provided notice of the general bar date and did not file a proof of claim.  The Plan was confirmed by the Bankruptcy Court on June 7, 2010, and became effective on June 22, 2010.  The Plaintiffs did not receive notice of the Plan nor did they file a response or an objection to the Plan.  The following Plan provisions are pertinent to the summary judgment motions before the Court:

Section 9.2 – "The Discharge Provision"

> Pursuant to section 1141(d) of the Bankruptcy Code . . . the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims . . . and causes of action of any nature whatsoever . . . whether known or unknown . . . whether or not . . . a Proof of Claim … is Filed or deemed Filed . . . or . . . the Holder of such a Claim or Equity Interest has accepted the Plan … The Confirmation Order shall be a judicial determination of the discharge of all Claims . . . subject to the Effective Date occurring.[35]

Section 9.5 – "The Injunction Provision"

> All Entities who have held, hold, or may hold Claims … permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action

---

[34] D.I. 91 at 25.

[35] Del. Bankr. 09-13333, D.I. 422 at 38.

> or other proceeding of any kind against the Debtors or the
> Reorganized Debtors . . . on account of such Claims[.][36]

The Confirmation Order was approved on June 7, 2010.  The Confirmation Order approved Article IX of the Plan as a whole and individually approved the Discharge and the Injunction provisions.[37]  The Plaintiffs did not receive notice of the Confirmation Hearing.

On March 20, 2015, the Plaintiffs filed a complaint in California Court against Joan F. Weiand, Joan F. Weiand Trust, and Weiand Automotive.[38]  In the California Action, the Plaintiffs seek, among other things, to recover past, present, and future environmental clean-up costs associated with the contamination and migration of hazardous waste on and below properties owned and leased by the Plaintiffs.  There are twelve separate cause of action. [39]

The federal claims include: CERCLA § 107(a)(1) and (a)(2), 42 U.S.C. §§ 9607(a)(1) and (a)(2) along with declaratory relief under CERCLA §§ 9607 and 9613.  The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) was designed to "facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the

---

[36] Del. Bankr. 09-13333, D.I. 422 at 39.

[37] Del. Bankr. 09-13333, D.I. 534, ¶ 34; Del. Bankr. 09-13333, D.I. 534, ¶ 40; Del. Bankr. 09-13333, D.I. 534, ¶ 49.

[38] C.D. Cal. 15-02105, D.I. 1; the California Action Plaintiffs assert claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and California state law.

[39] The restitution claim was dismissed by the California District Court given its similarity to the unjust enrichment claim.

wastes that caused harm."[40]   There are two types of CERCLA causes of action available to private parties that seek to recover costs associated with hazardous waste cleanup: (i) cost recovery actions under § 107(a) and (ii) contribution actions under 113(f)(1).  Cost recovery actions under § 107 allow the plaintiff to seek recovery for "necessary response costs" from responsible parties.  Response costs are broadly defined as investigation, removal, and remediation activities associated with the cleanup of hazardous waste.[41]

The remaining causes of action are California state law claims, which include: unjust enrichment, contribution under the California Hazardous Substances Account Act, declaratory relief under the California Health and Safety Code, continuing public nuisance, continuing private nuisance, negligence, negligence per se, waste, continuing trespass, equitable indemnity, and restitution.

On January 19, 2017 the California District Court entered the *Order re: Resolution of Discharge Issue by Bankruptcy Court*, which held that this Court should resolve the Claim Discharge Dispute.[42]  Since this case was reopened in April 2017, the Parties have filed three summary judgment motions.

On April 12, 2019, the Reorganized Debtors filed the *Motion of Reorganized Debtors for Summary Judgment on the Claim Discharge Dispute*.  They argue that the Discharge and Injunction Provisions in the Weiand Plan and Confirmation Order are enforceable on the Plaintiffs' California Action claims.  They seek summary judgment in their favor on the

---

[40] *OHM Remediation Servs. v. Evans Cooperage Co. Inc.*, 116 F.3d 1574, 1578 (5th Cir. 1997).

[41] *See* 42 U.S.C. §§ 9601(23)-(25) (2018).

[42] C.D. Cal 15-02105, D.I. 70.

following grounds: (i) the Plaintiffs' claims arose before the petition date, (ii) "the Plaintiffs received adequate notice of the Weiand Bankruptcy and the Discharge Documents,"[43] and (iii) the Plaintiffs cannot sue the Reorganized Debtors pursuant to an alleged breached of the Voluntary Cleanup Agreement because the Plaintiffs lack standing and because the Debtors rejected the Voluntary Cleanup Agreement in bankruptcy.

Additionally, on May 31, 2019, the Plaintiffs filed the *Cross Motion of the Mehrabian Family Trust and CA Auto Mart Group, Inc for Summary Judgment on the Claim Discharge Dispute*. They argue that the Discharge and Injunction Provisions in the Weiand Plan and Confirmation Order cannot be enforced on the Plaintiffs' California Action claims. They seek summary judgment in their favor on the following grounds: (i) the California Action claims after the Weiand Bankruptcy Plan was confirmed, (ii) the Plaintiffs did not receive constitutionally adequate notice of the deadline to file claims or the Plan Confirmation Hearing. More specifically, they assert that (a) the Plaintiffs were known creditors entitled to actual notice they did not receive, and (b) "publication notice of the deadline to file claims was . . . not reasonably calculated to provide notice of the deadline to unknown environmental claimants."[44]

Finally, on July 10, 2019, the Plaintiffs filed the *Motion of the California Action Plaintiffs for Summary Judgment on the Insured Claims*. They seek summary judgment that

---

[43] D.I. 91 at 3.

[44] D.I. 109 at 2.

declares that the Plan's Injunction does not bar their pursuit of the California Action in order to establish liability and to collect the applicable judgement from the Reorganized Debtors' insurer.  In opposition to the Plaintiffs' motion, the Reorganized Debtors argue that the Confirmation Order precludes the requested relief on the following grounds: (i) Plaintiffs did not timely assert their argument, (ii) the issue exceeds the scope of the *Order re: Resolution of Discharge Issue by Bankruptcy Court*, (iii) this Court lacks jurisdiction over the Insured Claims Dispute, and (iv) "any ruling would be an impermissible advisory opinion."[45]

## ANALYSIS

### I.    Summary Judgment Standard

Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial.  FED. R. Civ. P. 56, made applicable by FED. R. BANKR. P. 7056 is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[46]

When seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact."[47]  A genuine issue is not

---

[45] D.I. 112 at 2.

[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[47] *J. Aron & Co. v. SemCrude, L.P.* (*In re SemCrude, L.P.*), 504 B.R. 39, 51 (Bankr. D. Del. 2013) (*citing Celotex*, 477 U.S. at 322).

simply based on opposing opinions or unsupported assertions but rather on conflicting factual evidence over which "reasonable minds could disagree on the result."[48] Furthermore, a fact is material if it could "alter the outcome of a case."[49]  In other words, the movant's goal is "to establish an absence of evidence to support the nonmoving party's case."[50]

If the movant meets this initial burden, the burden shifts to the nonmoving party to defeat summary judgment by producing "evidence in the record creating a genuine issue of material fact."[51]  To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[52]  The nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of a nonmoving party."[53]  This evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[54]

---

[48] *Liquidation Tr. v.* Huffman (In *re U.S. Wireless Corp.*), 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citations omitted).

[49] *Id.*

[50] *Id.* (*quoting Celotex*, 477 U.S. at 325).

[51] *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009).

[52] *Matushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[53] *Giuliano v. World Fuel Servs., Inc.* (In *re Evergreen Int'l. Aviation*), 2018 WL 4042662, at *2 (Bankr. D. Del. Aug. 22, 2018) (citations omitted).

[54] *Liquidation Tr.*, 386 B.R. at 560 (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

When considering a motion for summary judgment, "the court does not weigh the evidence and determine the truth of the matter; rather, the court determines whether there is a genuine issue for trial."[55]  The Court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."[56] "If the opposition evidence is merely colorable or not significantly probative, summary judgment may be granted."[57]  However, where the record could lead reasonable minds to draw "conflicting inferences, summary judgment is improper, and the action must proceed to trial."[58] Summary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party.[59]

A cross-motion filing does not change the standards or analysis by which to grant or deny summary judgment to the moving party.  Each moving party still bears the initial burden of demonstrating the absence of a genuine issue of material fact.  "[T]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the [summary judgment] standard."[60]  Although the filing of a cross motion may imply that the parties

---

[55] *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del .2005) (*quoting Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986) (citations omitted)).

[56] *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir.2001).

[57] *Whitlock v. Pepsi Am*s., No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal Oct. 21, 2009) (citations omitted).

[58] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir.2000).

[59] *Id.*

[60] *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citations omitted).

agree that no material issue of fact exists, "the court is not bound by this implicit

agreement and is not required to enter a judgement for either party."[61]

## II.    The Claim Discharge Dispute

### A. A genuine dispute of material fact exists as to when the Plaintiffs' environmental claims arose.

The Parties dispute when the California Action claims arose.  The Plaintiffs

contend that the *Frenville* standard dictates that their claims are not dismissed by the

Confirmation Order.  *Frenville* references when a cause of action accrues under non-

bankruptcy law to determine when a claim arises in bankruptcy.[62]  The Plaintiffs assert

that, under non-bankruptcy law, a CERCLA claim does not arise until response costs are

incurred.  They argue they did not incur response costs until 2014—four years after the

Plan was confirmed—when they commissioned an environmental study of the Site and

the MFT property.[63]  Consequently, the Plaintiffs maintain that the California Action

claims were not discharged by the Confirmation Order.[64]  The Plaintiffs' brief does not

take a position as to when the California Action state law claims arose.[65]

---

[61] *The Liquidation Tr.*, 386 B.R. at 560-61 (*quoting WorldCom, Inc. v. HE Global Asset Mgmt. Servs. (In re WorldCom, Inc.)*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006).

[62] *Wright v. Corning*, 679 F.3d 101, 104 (3d. Cir. 2012) (*citing Avellino v. M. Frenville Co. (In re Frenville Co.)*, 744 F.2d 332 (3d Cir. 1984).

[63] D.I. 110, Exh. 21 (*Wells Report*).  The environment study was performed in connection with the Plaintiffs' longstanding interest in acquiring the Site.

[64] D.I. 109 at 7.

[65] *See* D.I. 109 at 23 n.6 ("It is less clear when the California state law claims accrued . . . However, given that the Mehrabian Parties should be permitted to proceed with their CERCLA claims in the California Action, the California court should be the court to determine when the state law claims accrued.").

The Reorganized Debtors argue that the Plaintiffs' CERCLA claims are discharged by the Bankruptcy Cases because the Plaintiffs incurred response costs before the Petition Date.  The Reorganized Debtors reference two incidents in support of this argument. First, they allege that the Plaintiffs incurred response costs in connection with a 2008 Phase I report at the MFT property.[66]  The Plaintiffs highlight a quotation from an interview in the Phase I report which noted that Mr. Mehrabian suggested that his property [*i.e.* the MFT Property] [was] not impacted [by contamination migration] based *on a few investigations* conducted so far."[67]  Second, they reference a 2006 letter that Mr. Mehrabian sent to Joan Weiand in which he says "[W]e have both already expended substantial funds to make this property attractive or environmentally safe . . . ."[68]

The Reorganized Debtors argue that the Plaintiffs' state law claims are discharged under *Frenville* because they occurred before the Petition Date.  Initially, they reference the Ninth Circuit's "fair contemplation test" as the non-bankruptcy law governing when a claim arises in bankruptcy.  The fair contemplation test provides that "all future response and natural resource damages cost[s] based on pre-petition conduct that can be fairly contemplated by the parties at the time of the [d]ebtors' bankruptcy are claims under the [Bankruptcy] Code.  The Reorganized Debtors conclude that "because

---

[66] D.I. 113 at 12.

[67] D.I. 113 at 12 (*citing* D.I. 93, Exh. 3J at 2) (emphasis added).

[68] D.I. 113 at 12 (*citing* D.I. Exh. 13 at 1) (citations omitted).

Plaintiffs either knew about or could have fairly contemplated their claims prior to the Petition Date, the claims arose pre-petition under . . . California state law . . . ."[69]

In the reply brief, while the Reorganized Debtors maintain that *Frenville* governs the state law claims, offer additional non-bankruptcy law standards by which they evaluate when the Plaintiffs' claims arose. These standards include the "knew or should have known" standard as well as the "suspect or reason to suspect standard."[70] They add that the discovery rule, which tolls the statute of limitation, is inapplicable given the abundance of information that should have "put a reasonable person on inquiry notice" of the Plaintiffs claims.

The Reorganized Debtors argue that under both CERCLA and California law "prior knowledge of surrounding contamination triggers a duty to investigate."[71] They allege that the Plaintiffs "purposefully ignored" evidence of hazardous waste migration in the surrounding area.[72] The Reorganized Debtors point to the following facts as evidentiary support that the Plaintiffs knew or could have fairly contemplated their state law claims prior to the Weiand Bankruptcy:

> (i)     "Mehrabian (on behalf of CA Auto Mart's d/b/a Glendale Kia) leased the Site from the [Weiand] Trust from 2002 to 2014 and was required to accommodate environmental remediation efforts on the Site."[73]

---

[69] D.I. 91 at 14.

[70] D.I. 113 at 5 and 7.

[71] D.I. 91 at 33.

[72] D.I. 91 at 38.

[73] D.I. 113 at 7.

(ii)    "CA Auto Mart sent several letters to JW in 2006 and 2007 that refer to alleged pollution on the Site as migrating to nearby and adjacent properties in an ever widening circle (i.e., the MFT Property)."[74]

(iii)    "Mehrabian obtained an appraisal of the Site, which noted that the Site was contaminated by hazardous substances requiring costly cleanup."[75]

(iv)    "Mehrabian was served between 1991 and 1999 with numerous documents regarding the clean-up in the area surrounding the MFT Property which reflected that contamination in the area was migrating between parcels neighboring the MFT Property, including the Site and the Taylor Yard."[76]

(v)    "Mehrabian was served in 2001 with the Union Pacific Settlement Order."[77]

(vi)    "A Phase I environmental assessment conducted on the MFT Property identifies potential exposure to hazardous materials. The Phase I [assessment also] discusses the potential impact to the MFT Property of contamination from the Site."[78]

(vii)    "Plaintiffs concede that, around 2005 or 2006, their representatives observed, and conversed with, workers performing remediation on the Site."[79]

(viii)    "Between 2006 and 2008, Mehrabian and CA Auto Mart were party to and were served with numerous documents in connection with litigation, involving the taking of a parcel of property adjacent to the Site and the MFT Property through eminent domain for the construction of a school. These documents reflect that contamination in the area was migrating from neighboring parcels, including the Site, onto the MFT Property and that extensive remediation was required."[80]

---

[74] D.I. 113 at 7.

[75] D.I. 113 at 8.

[76] D.I. 113 at 8.

[77] D.I. 113 at 8.

[78] D.I. 113 at 8.

[79] D.I. 91 at 13.

[80] D.I. 91 at 14.

Deciding when a claim in bankruptcy arises requires balancing "'two competing concerns: the Bankruptcy Code's goal of providing a debtor with a fresh start . . . and the rights of individuals who may be damaged by that conduct but are unaware of the potential harm at the time of the debtor's bankruptcy.'"[81]

The Parties are correct that a cause of action under CERCLA § 107 accrues when a plaintiff incurs necessary response costs in connection with the release of hazardous materials. Response costs include the costs of investigation, removal, remediation, as well as enforcement of the first three activities.[82] In *In re Allegheny Int'l Inc.*, the Third Circuit affirmed the Western District of Pennsylvania Bankruptcy Court's opinion which held that "the language of [§ 107(a)] mandates the conclusion that a [§ 107(a)] cause of action does not accrue until response costs are incurred."[83] The cause of action accrues at the first moment that a Plaintiff's money is spent.[84] Furthermore, "if any costs were incurred pre-petition, then a CERCLA claim arose as to that facility pre-petition, and all response costs incurred and to be incurred remediating the facility are dischargeable."[85]

---

[81] *In re Exide Tech.*, 600 B.R. 753, 759 (Bankr. D. Del 2019) (*quoting Wright v. Owens Corning*, 679 F.3d 101, 105 (3d. Cir. 2012).

[82] *See* 42 U.S.C. §§ 9601(23)-(25) (2018).

[83] *In re Allegheny Int'l, Inc.*, 126 B.R. 919, 925 (W.D. Pa.) *aff'd sub nom. Allegheny Int'l, Inc. v. AI Tech Specialty Steel Corp.*, 950 F.2d 721 (3d Cir. 1991).

[84] *See U.S. v. A&F Materials Co.*, 578 F. Supp 1249 (S.D. Ill 1984).

[85] *In re Allegheny Int'l, Inc.*, 126 B.R. 919, 926 (W.D. Pa.), *aff'd sub nom. Allegheny Int'l, Inc. v. AI Tech Specialty Steel Corp.*, 950 F.2d 721 (3d Cir. 1991).

In specific circumstances, the Federally Required Commencement Date controls when a state law property damage cause of action involving hazardous waste arises. CERCLA Section 9658 provides the following preemption guidance:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.[86]

The Ninth Circuit determined that "because the federal standard under CERCLA is more generous than California law in tolling the statute of limitations when a plaintiff's discovery of her claims is delayed, the federal commencement date preempts California's discovery rule."[87]  The federal discovery rule provides that a cause of action accrues when a plaintiff knows or reasonably should have known of "both the existence and the cause of his injury."[88]  Under this standard, "mere suspicion of the elements of a claim" is insufficient for the statute of limitations period to commence.[89]  Therefore, whether or not the California Action claims are discharged in this case depends on whether the Plaintiffs

---

[86] *See* 42 U.S.C. § 9658 (2018).

[87] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147 (9th Cir. 2002); *See SPPI-Somersville, Inc. v. TRC Cos.*, No Civ. 04-2648 SI, 2009 WL 2390347, at *4 (N.D. Cal. Aug. 3, 2009) (*finding* that *O'Connor* determined that the application of CERCLA's federally required commencement date controls when a statute of limitations begins to run on state law property claims).

[88] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147–48 (9th Cir. 2002) (*quoting U.S. v. Kubrick*, 444 U.S. 111, 113 (1979)).

[89] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147-48 (9th Cir. 2002).

knew or should have of both the existence and the cause of their injury (*i.e.* that hazardous waste had migrated from the Site onto MFT property) prior to the Effective Date.[90]

Courts apply a two-part test to determine when a plaintiff reasonably should have known of her claim. The first part asks "whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause or his or her injury."[91] For this component of the analysis, courts have considered: the number of potential causes of injury as well as the accessibility and source of the information that might put a reasonable person on inquiry notice. Ultimately, "a reasonable person with knowledge of contamination . . . would be expected to make a further investigation about the source."[92]

Assuming the reasonable person would be on inquiry notice as to her injury, the second part of the standard asks whether an inquiry "would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim. The plaintiff will be charged with knowledge of facts that he would have discovered through inquiry."[93]

A genuine dispute of material fact bars this Court from conclusively determining when the Plaintiffs' CERCLA response costs were incurred. The Reorganized Debtors' assertion that the Plaintiffs incurred response costs by commissioning the 2008 Phase I Report is disputable. The report, which was prepared for a bank performing diligence in

---

[90] Del. Bankr. 09-13333, D.I. 534.

[91] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

[92] *Lewis v. Russell*, No. CIV. 2:03-2646, 2012 WL 4747172 at *6 (E.D. Cal. Oct. 3, 2012).

[93] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Bibeau v. Pac. Nw. Research Foundation Inc.*, 188 F. 3d 1105, 1109 (9th Cir. 1999).

connection with a refinancing agreement with the Plaintiffs, does not suggest that the Plaintiffs paid for its production. The introductory pages of the report exclusively state that the report was prepared for Pacific Commerce Bank, not for the Plaintiffs.[94]   The Reorganized Debtors' expert report also belies the Reorganized Debtors' argument.  The Williams Report notes:

> Pacific Commerce Bank *hired* JMK Environmental Solutions to conduct a Phase I ESA for the MFT properties dated 10 November 2008.  However, the bank, not [the Plaintiffs] was designated as the user of the Phase I ESA, and it therefore does not satisfy [the Plaintiffs'] obligations to conduct environmental due diligence.[95]

Mr. Williams report notes that the bank was both the hiring entity and the ultimate consumer of the report.  These facts make it less likely that the Plaintiffs incurred response costs in connection with the Phase I report.

The Reorganized Debtors' assertion that the quotation from the Phase I report in which Mr. Mehrabian denied that his property had been contaminated based on investigations that had been conducted does not necessarily prove that the Plaintiffs' incurred prepetition response costs.  The fact that the Mr. Mehrabian stated that "[his] property [had] not [been] impacted based on a few investigations conducted so far" does not indicate who paid for these investigations.[96]   It is entirely possible that the investigatory efforts that Mr. Mehrabian referenced in this quotation were the Debtors' cleanup efforts at the Site in connection with the VCA.  Additionally, even if it were true

---

[94] D.I. 93, Exh. 3J (*JMK Environmental Report*).

[95] D.I. 91, Exh. 3 at 38 (emphasis added).

[96] D.I. 113 at 12 (*citing* Exh. 3J at 2).

that the Plaintiff paid for investigations in 2006 or in 2008, it is not clear that these costs

are necessary response costs under CERCLA § 107.  Response costs are deemed necessary

when "an actual and real threat to human health or the environment exists."[97]  Analyzing

costs to determine if they classify as necessary response costs requires weighing facts—

an exercise which is inappropriate at the summary judgment stage.

Furthermore, the Reorganized Debtors' interpretation of the Plaintiffs' October

2006 letter to the Reorganized Debtors in which he states "[w]e have both already

expended substantial funds to make this property attractive or environmentally safe"

also presents a genuine dispute of material fact.[98]  The Debtors believe that this letter is

further evidence that the Plaintiffs had incurred prepetition response costs.  However, an

alternative reading of this text reveals the possibility that the Plaintiffs were not

referencing their environmental efforts but rather their renovation efforts.  It is not

necessarily clear from the quoted sentence that Mr. Mehrabian engaged in environmental

cleanup.  In fact, the sentence refers to the collective efforts of both parties.  It is possible

that Mr. Mehrabian is referencing his efforts in one of the two categories listed in the

quoted text and not both.  This alternative interpretation is supported by the following:

(i) the Reorganized Debtors were engaged in remediation efforts pursuant to the

Voluntary Cleanup Agreement at the time this letter was written, (ii) the letter references

"the poor condition of the buildings," "poor drainage," and the need to meet the "modern

---

[97] *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (*quoting Carson Harbor Vill., Ltd. v. Unocol Corp.*, 270 F.3d 863, 871 (9th Cir. 2001).

[98] D.I. 91, Exh. 13 (Oct. 5, 2006 Letter).

safety and code requirements of the City of Los Angeles,"[99] (iii) Mr. Mehrabian denied using the funds to make the Site environmentally safe in his deposition,[100] and (iv) Mr. Mehrabian wrote a similar letter one month later in which he describes the "need for renovation" and the untenable state of the property.[101]

With respect to the Plaintiffs' California state law claims, a genuine dispute of material fact also exists as to when these claims arose. At this time, the Court cannot draw a singular inference in favor the Plaintiffs or the Reorganized Debtors with regard to when the Plaintiffs should have reasonably known of "both the existence and cause of [their] injury."[102]

The first part of the two part inquiry requires this Court to ask "whether a reasonable person in the Plaintiffs' situation would have been expected to inquire about the cause or his or her injury."[103] There are a number of facts in the record which the Reorganized Debtors argue put the Plaintiffs on inquiry notice: (i) the Plaintiffs' 2005 appraisal of the Site which noted that it was contaminated with hazardous substances,[104] (ii) From 2002-2014 the Plaintiffs leased the Site from the Reorganized Debtors and observed and engaged with workers remediating the Site pursuant to the VCA, (iii) the Plaintiffs were aware of the history of hazardous waste migration from the Site to

---

[99] D.I. 91, Exh. 13 (Oct. 5, 2006 Letter).

[100] D.I. 109, Exh. A (Tr. 86:11-86:14).

[101] D.I. 91, Exh. 14 at 2. (Nov. 1, 2006 Letter).

[102] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147-48 (9th Cir. 2002) (*quoting U.S. v. Kubrick*, 444 U.S. 111, 113 (1979).

[103] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

[104] D.I. 113 at 8.

neighboring properties which they acknowledged in letters to the Reorganized Debtors, (iv) the Plaintiffs had knowledge of the Reorganized Debtors' Union Pacific Railroad litigation involving the hazardous waste migration from the Site to Taylor Yard,[105] (v) there were numerous investigation and remediation efforts at neighboring properties (the Site, Taylor Yard, and Pacific Plastics), and (vi) publicly available information about migrating hazardous waste and remediation efforts on neighboring properties that was also specifically mailed to the Plaintiffs,[106] and (vii) the Phase I report which "identified the MFT Property as being at risk of potential exposure to hazardous materials due to surrounding contamination . . . ."[107]  It is plausible that the totality of facts presented would put a reasonable person on inquiry notice.

Nevertheless, there is also evidence that these facts would not have put the Plaintiffs on inquiry notice that hazardous waste migration from the Site was a threat to the MFT Property. These facts include: (i) the colorless and odorless nature of PCE,[108] (ii) the fact that DTSC did not oversee any remediation or investigative efforts on MFT Property in connection with the VCA or otherwise, (iii) the plume diagram the Plaintiffs received in connection with Union Pacific Litigation with the Reorganized Debtors did not indicate that the MFT Property was in the directional path of the hazardous waste

---

[105] The Plaintiffs were served with the Settlement Agreement between the Reorganized Debtors and Union Pacific Railroad.

[106] D.I. 113 at 8.

[107] D.I. 113 at 12.

[108] D.I. 110, Exh. 21 (*Wells Report*) at 15.

traveling from the Site,[109] (iv) the three significant environmental investigations neighboring the MFT Property (*i.e.* the Site, Taylor Yard, and Pacific Plastics) did not signal that neighboring sites posed a threat to MFT Property,[110] (v) Taylor Yard investigation and remediation efforts deployed monitoring devices on the Site and the Profile Plastics property (who became defendants) but  not on MFT property or the SCE property which separates Weiand and the MFT property, [111] (vi) the existence of publicly available information and public coverage has is in some cases not been sufficient to put Plaintiffs on inquiry notice,[112] (vii) Plaintiffs deny receiving any documents from a governmental agency or court related to the Site, MFT Property, Union Pacific Action, or Taylor Yard,[113] and (viii)  it is not clear that the Plaintiffs had access to the Phase I report or that the report's warning of potential exposure to hazardous material would have been heeded given that the report was based on a review of public records that involved "no sampling of physical or chemical material or laboratory analysis . . . ."[114]

---

[109] D.I. 110, Exh. 21 (*Wells Report*) at 12.

[110] D.I. 110, Exh. 21 (*Wells Report*) at 10-11. In his expert report, James Wells notes:

> In my review of documentation from these investigations, there is no evidence that [the MFT Property] was suspected of being contaminated; there is no evidence that anyone (prior to my team) sought to collect subsurface samples from [the Plaintiffs'] site; there is no evidence that any party that identified that contamination may be entering [the Plaintiffs'] site; and there is no evidence that any party informed [the Plaintiffs] of concerns regarding contamination entering [their] site.

[111] D.I. 110, Exh. 21 (*Wells Report*) at 11.

[112] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1152-53 (9th Cir. 2002).

[113] D.I. 110, Exh. 12 at 11.

[114] D.I. 110, Exh. 3J at 29.

For the second component of the test, the Court is hamstrung by an undeveloped factual record. At this time, there is no scientific evidence to determine when the hazardous waste from the Site began to contaminate the Plaintiffs' property. Therefore, even if the Plaintiffs were on inquiry notice, it would be impossible for the court to charge the Plaintiffs with knowledge of facts they would have discovered through inquiry.

Overall, the Court cannot determine on summary judgment when the California Actions claims arose. With respect to CERCLA claims, there is a genuine dispute of material fact as to when response costs were incurred. With respect to state law claims, factual disputes remain as to if the Plaintiffs would have been on inquiry notice about hazardous waste migrating onto their property from the Site. Furthermore, the Court does not have enough information to conduct the second part of the *O'Connor* analysis.

It is worth briefly mentioning that the continuing public nuisance, the continuing private nuisance, and the continuing trespass causes of action are qualitatively different than the other causes of action stated in the Plaintiffs' complaint. All three causes of action potentially belong to a category of continuing torts, which California courts differentiate from permanent torts. In contrast with permanent torts, continuing torts are ongoing such that "every continuation of the [tort] gives rise to a separate claim for damages caused by that [tort]." The effect of a continuing tort on a discharge could mean that the Reorganized Debtors could potentially remain liable for post-effective hazardous waste migration onto MFT Property. Nevertheless, the Court would need to make a

factual determination as to the permanent or continuous nature of the torts in this case, which is inappropriate at the summary judgment stage.[115]

    **B. No singular inference can be drawn as to if the Plaintiffs were known creditors or if the Plaintiffs received constitutionally adequate publication notice of the Bankruptcy proceedings.**

The Court established February 1, 2010 as the General Bar Date.[116] The Debtors mailed notice of the bar date to known creditors and parties-in-interest on December 31, 2009, and provided publication notice of the bar date in the *USA Today* on December 17, 2009.[117]  Actual and publication notice of the Confirmation Hearing and Confirmation Order was provided for the same categories of creditors via the same two methods.  The Plaintiffs did not receive actual notice of the General Bar Date, Confirmation Hearing, or Confirmation Order.  The Plaintiffs did not file a proof of claim in the Bankruptcy.

The Plaintiffs contend that even if their claims arose prior to the Confirmation Order, these claims were not discharged because they did not receive constitutionally adequate notice. They argue that the Debtors' notice was insufficient irrespective of their classification as a known or an unknown creditor.

The Plaintiffs allege that the Debtors knew or should have known that the Plaintiffs were known creditors who were entitled to actual notice of the bar date and

---

[115] *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1143 281 Cal. Rptr. 827 (1991).

[116] D.I. 91 at 27.

[117] D.I. 91 at 27.

plan confirmation proceedings.[118]  The Plaintiffs maintain that the Debtors had actual or constructive knowledge that the Plaintiffs were potential claimants because the Debtors: (i) were defendants who possessed files in connection with the Union Pacific Litigation which involved the migration of hazardous waste from the Site to neighboring properties,[119] (ii) sought to implead the  Plaintiffs in the Union Pacific Litigation,[120] (iii) served the Plaintiffs with copies of the Union Pacific Settlement, (iv) had not comprehensively investigated or remediated neighboring properties after having been sued for contamination migration, (v) possessed books and records that, had they been carefully reviewed, would have revealed that the Plaintiffs had possible claims against them for damages,[121] and (vi) had occupied the Site for twenty-six years.   The Reorganized Debtors assert that this information would have revealed the Plaintiffs as possible known creditors who would have been "reasonably ascertainable" to the Debtors without the need for impractical or extended searches.[122]

In the event this Court finds the Plaintiffs are unknown creditors, the Plaintiffs argue that the Debtors publication notice was constitutionally inadequate because they failed to also publish bar date notice in a local newspaper proximate to the Weiand Site.[123] In their view, this additional notice mechanism "would have been substantially more

---

[118] D.I. 109 at 8.

[119] D.I. 109 at 26.

[120] D.I. 109 at 27.

[121] D.I. 109 at 26-27.

[122] D.I. 109 at 29.

[123] D.I. 109 at 10.

likely to reach those who may have had environmental claims arising from contamination at the Weiand Site."[124]  They argue that the cases that the Reorganized Debtors reference as supporting the adequacy of their publication notice (*In re Exide* and *Wright v. Corning*) are factually and circumstantially dissimilar from the present case.[125]  Nevertheless, to display the inadequacy of the Reorganized Debtors publication notice program, the Plaintiffs contrast the Reorganized Debtors' single newspaper publication notice with the *Exide* debtors' constitutionally adequate publication notice which consisted of two national newspapers and 130 local newspapers.[126]  The Plaintiffs also reference *In re Buttes Gas & Oil Co.* as an analogous situation in which publication notice was found to be inadequate because the debtor failed to publish notice in a California newspaper despite having business operations in that state at the time of the petition date.[127]

The Reorganized Debtors argue that the Plaintiffs were unknown claimants.  They assert that they fulfilled their diligence obligation—which they contend is confined to a careful review of books and records—when they worked with three law firms to review their books and records for known creditors.[128]  They reject the idea that the Union Pacific Litigation would have revealed the Plaintiffs were known creditors as lacking evidentiary basis.[129]  The Reorganized Debtors emphasize that they would have no reason to have

---

[124] D.I. 109 at 33.

[125] D.I. 109 at 33-34.

[126] D.I. 109 at 34.

[127] D.I 109 at 33.

[128] D.I. 91 at 26.

[129] D.I. 113 at 14.

known that the Plaintiffs were creditors because: (i) Weiland relocated operations to Kentucky approximately ten years before the Petition Date,[130] (ii) Weiland ceased using hazardous substances (including PCE) in 1986,[131] (iii) the Plaintiffs never contacted them regarding any claims, and (iv) the Reorganized Debtors believed that the Plaintiffs claims were barred under the Union Pacific Settlement Order.   Given these facts, the Reorganized Debtors allege that the only way that they could have been able to establish the Plaintiffs as a known creditor would have been through a title search, which courts have been deemed unreasonable searches for debtors.

The Reorganized Debtors also argue that, as unknown claimants, the Plaintiffs received sufficient notice of the General Bar Date, Confirmation Hearing, and Confirmation Order through publication in the *USA Today*.[132]  The Reorganized Debtors contend that the Plaintiffs received constitutionally adequate publication notice for the following reasons: (i) the Court approved this method of publication notice as evidenced in the Bar Date Order, Solicitation Order, and the Confirmation Order,[133] (ii) in 2009, at the time of the Petition Date, the *USA Today* "was the nation's largest selling daily print newspaper," which "had the nation's widest circulation of any newspaper in the United States after the *Wall Street Journal* and a circulation of three times that of the Los Angeles Times," [134] (iii) the Bankruptcy Code, Bankruptcy Rules, and Delaware Local Rules do not

---

[130] D.I. 113 at 15.

[131] D.I. 113 at 18.

[132] D.I. 91 at 14.

[133] D.I. 113 at 16.

[134] D.I. 113 at 16-17.

require publication notice in more than one newspaper,[135] (iv) both *In re Buttes Gas and Oil* and *In re Exide* are factually dissimilar from the present case and that *Wright v. Corning* affirms that national newspaper publication is sufficient notice to unknown creditors.

Procedural due process is a fundamental component of chapter 11 bankruptcy because of the broad authority that may be granted to those that seek its protection. The "reorganization process is dependent on the proper notification to creditors and other interested parties of all important steps in the proceeding so that they may take such steps as necessary to safeguard their interests."[136] Notice must be "reasonably calculated to reach all interested parties, reasonably convey[] all required information, and permit[] a reasonable time for a response."[137] Consequently, a confirmed plan of reorganization that discharges claims and enjoins attendant causes of action against the debtors pursuant to § 1141(d) is "unenforceable against entities that did not receive adequate notice of the bankruptcy or an opportunity to contest confirmation."[138]

A known creditor is "one whose identity is either known or reasonably ascertainable by the debtor."[139] The Third Circuit defined "reasonably ascertainable" as the following:

> A creditor's identity is "reasonably ascertainable" if that
> creditor can be identified through reasonably diligent efforts

---

[135] D.I. 113 at 18.

[136] *In re Harbor Tank Storage Co.*, 385 F.2d 111, 115 (3d Cir. 1967).

[137] *In re Exide Techs.*, 600 B.R. 753, 763 (Bankr. D. Del. 2019) (*quoting Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d. Cir. 1995) (citation omitted).

[138] 8 Collier on Bankruptcy P 1141.06. 16th Edition.

[139] *In re Exide Techs.*, 600 B.R. 753, 763 (Bankr. D. Del. 2019) (citations omitted).

> . . . Reasonable diligence does not require impracticable and extended searches . . . in the name of due process . . . A debtor does not have a duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it . . . The requisite search instead focuses on the debtor's own book and records. Efforts beyond a careful examination of these documents are generally not required . . . . [140]

Courts have found "impracticable and extended" searches to include: expansive title searches on all neighboring properties, undefined investigations, or any search that involves a great deal of speculation.[141]  Ultimately, a debtor "need not be omnipotent or clairvoyant" in the identification of known creditors.[142]  Once a debtor has identified known creditors, it must deliver actual written notice to them of the bankruptcy and the bar date.[143]

Both the Reorganized Debtors and the Plaintiffs incorrectly construe the meaning of "reasonably ascertainable."  First, actual notice is not based on foreseeability.  The Plaintiffs assert that they were known creditors because the Reorganized Debtors knew or reasonably should have known that the Plaintiffs might have had a claim against Weiland Automotive or damages associated with contamination migration.    In *Chemetron*, the Third Circuit expressly rejected the "reasonably foreseeable" analysis in

---

[140] *In re Exide Techs.*, 600 B.R. 753, 763 (Bankr. D. Del. 2019) (citations omitted).

[141] *See e.g. In re Exide Techs.*, 600 B.R. 753, 764 n.37. (Bankr. D. Del. 2019).

[142] *In re Nortel Networks, Inc.*, 531 B.R. 53, 63 (Bankr. D. Del 2015) (*quoting In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 46 (Bankr. D. Del. 2012) (citations omitted)).

[143] *In re Exide Techs.*, 600 B.R. 753, 763 (Bankr. D. Del. 2019) (*citing Energy Future Holdings Corp.*, 522 Bankr. 520, 529 (Bankr. D. Del 2015)).

identifying known creditors as "put simply, such a test would place an impossible burden on debtors."[144]

Second, the Reorganized Debtors' assertion that "reasonably ascertainable" entails only a reasonably diligent review of a debtor's books and records is overly restrictive. The "general rule in the Third Circuit is that a debtor is not required to look beyond its own books and records."[145] However, the Third Circuit has also held that "[s]ituations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records."[146] While the Third Circuit did not outline the contours of this exception, it is evident that the Courts understanding of "reasonable diligence" is broader than that of the Reorganized Debtors. It is likely that this diligence exception, which is both non-speculative but extends beyond a debtor's review of its books and records resembles a diligence standard used in the First, Fourth, and Fifth Circuits. They have concluded that creditors are known when "a debtor has *specific information related to an actual injury* suffered by the creditor. Information, however specific, that makes a claim only foreseeable or conjectural is insufficient."[147]

Third, the Reorganized Debtors misunderstand the notice responsibilities of a debtor in bankruptcy. The fact that the Debtors relocated operations to a different state

---

[144] *Chemetron Corp. v. Jones*, 72 F.3d 341, 347 (3d Cir. 1995).

[145] *In re Exide Techs.*, 600 B.R. 753, 764 (Bankr. D. Del. 2019).

[146] *In re Exide Techs.*, 600 B.R. 753, 764 (Bankr. D. Del. 2019) (*citing Chemetron Corp. v. Jones*, 72 F.3d 341, 347 n.2. (3d Cir 1995).

[147] *In re Placid Oil Co.*, 753 F.3d 151, 156 (5th Cir. 2014) (emphasis added) (*quoting In re Crystal Oil*, 158 F.3d 291, 297 (5th Cir. 1998); *See e.g. In re J.A. Jones, Inc.*, 492 F.3d 242, 251-252 (4th Cir. 2007); *See e.g. In re Arch Wireless, Inc.*, 534 F.3d 76 (1st Cir. 2008).

or that the Plaintiffs did not contact the Debtors regarding a claim during the near decade between the Union Pacific Settlement and the Weiand Bankruptcy Petition Date does not excuse the Debtors of their constitutional notice responsibilities.  As the Supreme Court has stated, "'a creditor's ability to take steps to safeguard its interests does not relieve the [debtor] of its constitutional obligation to provide adequate notice of the bar date.'"[148] "[E]ven creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred."[149]  All notice must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[150]

No singular inference can be drawn as to if the Plaintiffs were known creditors of the Debtors.  It is hard to believe that the Plaintiffs were not in the Reorganized Debtors books and records during the time of or closely leading up to the Weiand Bankruptcy. As the Debtors point out in their brief, the Plaintiffs leased and were in negotiation to purchase the Site from 2002 to 2014, a period which overlaps with the Weiand Bankruptcy.  The Parties' previous business relationship and the Reorganized Debtors' history of litigation involving hazardous waste migration from the Site to neighboring properties suggests that the Plaintiffs were foreseeable claimants.  Nevertheless, the

---

[148] *In re Charter*, 125. B.R. 650, 655 n.3 (Bankr. M.D. Fla. 1991) (*quoting Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 799 (1983)).

[149] *City of N.Y. v. N.Y., N. H. & H. R. Co.*, 344 U.S. 293, 297 (1953).

[150] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Third Circuit's known creditor standard includes actual creditors but not foreseeable ones.  At the Petition Date, the Debtors books and records did not show evidence of an actual injury to the Plaintiffs resulting from the migration of hazardous waste to the Site that would make them known creditors.  Outside of the context of books and records, whether the Debtors "ha[d] specific information related to an actual injury suffered by the creditors" is unclear.[151]  This is a question of fact that, while worth exploring, is inappropriate for the summary judgment stage.

Furthermore, no singular inference can be drawn regarding the adequacy of the Debtors' publication notice.  An unknown creditor is "'one whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the [the debtor's] knowledge.'"[152]  "'It is well settled that constructive notice of the claims bar date by publication . . . generally satisfies the requirements of due process for unknown creditors.'"[153]  The Third Circuit has held, however, that while publication in national newspapers is sufficient notice to unknown creditors, this is true "'especially where supplemented . . . with notice in papers of general circulation in locations where the debtor is conducting business.'"[154]  The notion that

---

[151] *In re Placid Oil Co.*, 753 F.3d 151, 156 (5th Cir. 2014) (*citing In re Crystal Oil*, 158 F.3d 291, 297 (5th Cir. 1998); *See e.g. In re J.A. Jones, Inc.*, 492 F.3d 242, 251-252 (4th Cir. 2007); *See e.g. In re Arch Wireless, Inc.*, 534 F.3d 76 (1st Cir. 2008).

[152] *In re Exide Techs.*, 600 B.R. 753, 763 (Bankr. D. Del. 2019) (*quoting Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d. Cir. 1995)).

[153] *In re Exide Techs.*, 600 B.R. 753, 764 (Bankr. D. Del. 2019) (*quoting In re Nortel Netowrks* Inc., 531 B.R. 53, 64 (Bankr. D. Del. 2015)).

[154] *In re Energy Future Holdings Corp.*, 522 B.R. 520, 529 (Bankr. D. Del. 2019) (*quoting Chemetron Corp. v. Jones*, 72 F.3d 341, 349 (3d Cir. 1995)).

adequate publication notice is especially true when supplemented with publication notice in locations in which the debtor is conducting business does not indicate that without this supplemental notice, publication in national newspaper is constitutionally inadequate.[155]

"The proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice."[156]  This inquiry requires the Court to balance competing interests.  In describing this balancing process, the Fourth Circuit stated that the bankruptcy court must:

> balance the needs of notification of potential claimants with the interests of existing creditors and claimants.  A bankruptcy estate's resources are always limited and the bankruptcy court must use discretion in balancing these interest when deciding how much to spend on notification.[157]

The Plaintiffs argue that the Debtors' publication notice was inadequate because national publication supplemented by publication in the *Los Angeles Times* "would have been substantially more likely to reach those who may have had environmental claims arising from contamination at the Weiand Site . . . ."[158]  This statement lacks evidentiary support and may not be true. Determining the adequacy of publication notice is a fact-intensive

---

[155] *See In re XO Commc'ns, Inc.*, 301 B.R. 782, 795 (Bankr. S.D.N.Y. 2003) (*holding* that notice published once in the *Wall Street Journal* was sufficient constructive notice of hearing of reorganization plan); *In re Chicago Pac. Corp.* 773 F.2d 909 (7th Cir. 1985).

[156] *In re New Century TRS Holdings, Inc.*, 465 B.R. 49 (Bankr. D. Del. 2012) (citations omitted).

[157] *In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 50 (Bankr. D. Del. 2012) (*quoting Vancouver Women's Health Collective Soc. v. A.H. Robins Co.*, 820 F.2d 1354 (4th Cir. 1987)).

[158] D.I. 109 at 33.

analysis that "depends on the circumstances of a particular case."[159] At this time, the record is not sufficiently developed for this Court to draw a singular inference as to if publication notice of the deadline to file claims was constitutionally adequate.

Based on the above, no singular inference can be drawn as to if the Plaintiffs received adequate notice of the Bankruptcy proceedings.  The factual record is not sufficiently developed for the Court to determine if the Plaintiffs were known creditors or if the Debtors' publication notice was constitutionally adequate.

C. **The Court need not address the whether the Plaintiffs have standing to assert their claims pursuant to the Debtors alleged breach of the Voluntary Cleanup Agreement.**

On July 25, 2001 as part of the settlement with Union Pacific regarding the migration of hazardous waste, Joan Weiand and Weiand Automotive entered into a VCA with the DTSC for, among other things, the investigation and cleanup of the Site. Pursuant to Section 1.4 of the Agreement, "if DTSC determine[d] that [the Reorganized Debtors] ha[d]complied with th[e] Agreement . . . DTSC [would] issue a "no further action letter."[160]

Pursuant to the VCA, Weiand and Joan Weiand submitted a November 2003 Removal Action Workplan which indicated that on-site and off-site groundwater testing was forthcoming.[161]   In subsequent months, the DTSC issued warnings on

---

[159] *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012) (citation omitted).

[160] D.I. 93, Exh. 3C.

[161] D.I. 110, Exh. 25 at 39.

September 1, 2009 and January 5, 2012.[162]   Yet, the groundwater testing was never

completed.[163]   On the Petition Date (September 28, 2009), Weiand stopped fulfilling its

obligations under the VCA—ceasing contributions to the Removal Action Workplan

Costs and ending its monitoring of Workplan operations.[164]   On the Effective Date

(June 22, 2010), the Debtors rejected the VCA.[165]   Despite their unheeded warnings to

complete groundwater sampling, on September 13, 2016, the DTSC issued a "no further

action letter" that "[c]ertifie[d] that all necessary response actions have been completed

for the Weiand property and no further activities [were] required."[166]

From the Reorganized Debtors' perspective, "the Plaintiffs allege that their claims

arise from Weiand's failure to comply with the terms of the VCA after the Effective Date

of the Plan."[167] The Reorganized Debtors contend that: (i) the Plaintiffs have no privity

with the Reorganized Debtors under the VCA and, therefore, have no enforcement rights,

(ii) the VCA was an executory contract rejected in bankruptcy, under which the

Reorganized Debtors have no further obligations, (iii) their rejection of the executory

contract would result in a prepetition breach and the Plaintiffs' classification as general

unsecured creditors who receive no payout under the Plan, (iv) there was no breach of

---

[162] D.I. 110, Exh. 27; D.I. 110, Exh. 30.

[163] D.I. 110, Exh. 19 (Tr. 58:24-60:15).

[164] D.I. 110, Exh. 19 (Tr. 57:23- 60:15).

[165] D.I. 91 at 30.

[166] D.I. 93, Exh. 21 at 4.

[167] D.I. 91 at 44.

the VCA given that the DTSC sent a "no further action" letter to the Reorganized Debtors in 2016.  The Plaintiffs have not responded to any of these assertions in their briefs.

The Court need not address this issue given that the basis for the Reorganized Debtors' allegation is a May 2018 position statement letter the Reorganized Debtors received from the Plaintiffs nearly one year before any of the briefs were written. Furthermore, the contract breach argument that the Debtors claim the Plaintiffs made is not found in the record.  Therefore, the Court need not address this issue.

## III.    The Insured Claims Dispute

If the Plaintiffs are denied summary judgment on the Claim Discharge Dispute, they seek a summary judgment order stating that Discharge Injunction does not preclude them from (i) prosecuting the California Action to judgment to establish Weiand Automotive's liability, and (ii) seeking recovery of applicable insurance proceeds from the Reorganized Debtors' insurers.[168]  The Plaintiffs assert that although the Third Circuit has held that § 524(a) prohibits creditors from pursuing their claims against a debtor, § 524(e) does not enjoin creditors from recovering against non-debtor insurers.[169]  They believe their interpretation of the discharge injunction remains true even if a creditor does not file a proof of claim in a bankruptcy case.[170]

Additionally, they argue that "this Court has 'core arising in' jurisdiction to consider the relief requested in the Motion because the relief . . . is available only because

---

[168] D.I. 105 at 11.

[169] D.I. 105 at 11.

[170] D.I. 105 at 12-13.

Weiand Automotive filed its bankruptcy case."[171]  They contend that they are not asking this Court to render an advisory opinion and that the relief that the remedy they seek does not require this Court to determine the applicability of any policies, exclusions, or legal defenses.[172]  They maintain that any interpretation of the applicability of policies, exclusions, legal defenses or any other insurance issues should be decided by the California Court.[173]

The Reorganized Debtors believe that this Court should deny the Insured Claims Motion on jurisdictional and procedural grounds.  They claim that this Court at best has non-core "related to" jurisdiction over the Insured Claims Dispute and likely has no jurisdiction at all.  In support of their argument, they reference three cases involving non-debtor parties where the Delaware Bankruptcy Court declined to interpret its own orders because it determined that the matter at issue exceeded the scope of this Court's jurisdiction.[174]

In *In re Desa Holdings Corporation*, the Delaware Bankruptcy Court determined that it did not have jurisdiction to interpret its sale order in part because the matter "d[id] not involve the amount of property for distribution or the allocation of assets among creditors . . . ."[175]  In *In re Thane International*, the Delaware Bankruptcy Court refused to

---

[171] D.I. 119 at 12.

[172] D.I. 119 at 17.

[173] D.I. 119 at 14.

[174] *In re Desa Holdings Corp.*, 353 B.R. 419 (Bankr. D. Del 2006); *In re Thane Int'l*, 586 B.R. 540 (Bankr. D. Del 2018); *In re Wash. Mut., Inc.*, No. 12-50422, 2012 WL 4755209 (Bankr. D. Del. Oct. 4, 2012).

[175] D.I. 112 at 12.

address the underlying state law breach of contract claim that sprang from its interpretation of its sale order clarifying an executory contract. In *In re Washington Mutual, Inc.*, the Court declined to interpret its plan and confirmation order to issue a declaratory judgment "to determine insurance coverage on a pre-petition state law contract [as it] d[id] not involve the bankruptcy petition itself or any steps within the bankruptcy case . . . ."[176]

The Reorganized Debtors believe the Court lacks jurisdiction over the Insured Claims Dispute because, like in *Desa Holding Corporation, Thane International, and Washington Mutual,* the Insured Claims Dispute does not involve the amount of property for distribution or the allocation of assets among creditors. Instead, they believe the Insured Claims Dispute involves prepetition state law claims and does not involve the Reorganized Debtors facing liability. Consequently, the Reorganized Debtors argue that "a determination of rights to pursue claims against insurance policies where the . . . Debtors face no liability on the discharged claims is clearly beyond the scope of even related to jurisdiction."[177]  Under these circumstances they conclude that an interpretation of a plan and confirmation order does not provide the requisite close nexus to confer jurisdiction.[178]

The Reorganized Debtors also argue that any decision on the Insured Claims Dispute would exceed the scope of its authority under the California Court's *Order re*

---

[176] D.I. 112 at 14.

[177] D.I. 112 at 7.

[178] D.I. 112 at 14.

*Resolution of Discharge Issue by Bankruptcy Court*, which it contends is restricted to the Claim Discharge Dispute.[179]  In *In re Desa* they highlight that the "Delaware Superior Court specifically asked for clarification from the bankruptcy court as to whether the lift stay order permitted the claimant to sue the buyer."[180]  In that case, the Delaware Bankruptcy Court interpreted the lift stay order but refused to provide clarification around one of the litigant's request for a sale order.  Viewing the present case as analogous, the Reorganize Debtors argue that this Court should similarly decline to address an issue that it views as outside of the request of a sister court.

The Reorganized Debtors assert that any ruling on the Insured Claims Dispute would be an impermissible advisory opinion that would involve the adjudication of policies, exclusions, and defenses all of which this Court lacks jurisdiction to decide.[181]

Along with the above arguments, the Reorganized Debtors argue that the Plaintiffs' Summary Judgment Motion on Insured Claims should be denied on the grounds that the Plaintiffs did not assert that the Insured Claims issue until four years after the California Action Complaint was filed.[182]

---

[179] D.I. 112 at 10.

[180] D.I. 112 at 10.

[181] D.I. 112 at 16.

[182] D.I. 112 at 9.

### A.  This Court has core jurisdiction over the Insured Claims Dispute.

This Court's determination of the enforceability of the Discharge Injunction is a core proceeding.  The Reorganized Debtors are incorrect in asserting that this Court would have "related to jurisdiction" or no jurisdiction over the Insured Claims Dispute.

Federal statutory law provides that a "district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title."[183]  Bankruptcy courts exercise jurisdiction over four types of title 11 matters: "(1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11."[184]  Each matter category is defined as follows:

> A case 'arises under' Title 11 when the cause of action is based on a right or remedy expressly provided by the Bankruptcy Code.  Proceedings 'arising in' a case under Title 11 include matters that, though not explicitly mentioned in the Code, would not exist outside of bankruptcy.  Related matters are generally causes of action under state law that are imported into the bankruptcy because of their impact on the size of the debtor's estate, and hence the distribution to the debtor's creditors.[185]

Each of these four matters over which bankruptcy courts have jurisdiction is classified as either a core or non-core proceeding.  Cases arising under title 11, and proceedings arising in a case under title 11 are core proceedings; proceedings related to

---

[183] 28 U.S.C. § 157(c)(2) (2018).

[184] *In re Wash. Mut., Inc.*, No. 08-12229, 2012 WL 4755209, at *2 (Bankr. D. Del. Oct. 4, 2012) (citations omitted).

[185] *In re Kewanee Boiler Corp.*, 270 B.R. 912, 917 (Bankr. N.D. Ill. 2002) (internal citations omitted).

a case under title 11 are non-core proceedings.  This jurisdictional bifurcation "defines the contours of a bankruptcy judge's power . . . ."[186]

For non-core proceedings related to a matter under title 11 a bankruptcy court has advisory power and "'shall submit proposed findings of fact and conclusions of law to the district court' subject to de novo review by that court."[187]  In this circumstance, the district court enters final orders.  In contrast, core proceedings "invoke[] a substantive right provided by title 11 or one that by its nature could arise only in the context of a bankruptcy case."[188]  A bankruptcy court has final adjudicative power over core proceedings that is "subject to appellate review by district courts."[189]

In a post-confirmation context where a matter is non-core the Third Circuit requires courts to apply its "close nexus test" to determine whether it has jurisdiction.[190] This test is applied irrespective of "when the conduct giving rise to the claim or cause of action occurred."[191]  The Third Circuit has held:

> [T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan.  But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-

---

[186] *In re Kewanee Boiler Corp.*, 270 B.R. 912, 917 (Bankr. N.D. Ill. 2002).

[187] *In re Resorts Intern., Inc.*, 372 F.3d 154, 162 (Bankr. N.D. Ill. 2002) (*quoting* 28 U.S.C. § 157 (c)(1) (2004)).

[188] *In re Resorts Intern., Inc.*, 372 F.3d 154, 162 (3d Cir. 2004) (citations omitted).

[189] *In re Resorts Intern., Inc.*, 372 F.3d 154, 162 (3d Cir. 2004).

[190] *In re Resorts Intern., Inc.*, 372 F.3d 154, 162 (3d Cir. 2004).

[191] *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 265 (3d Cir. 2007).

confirmation bankruptcy court jurisdiction is normally appropriate.[192]

The "close nexus" standard is only applied to determine whether "a federal court has jurisdiction over a non-core 'related to' proceeding . . . ."[193] Therefore, where a matter is core proceeding, the "close nexus test" is inapplicable because the Court already has jurisdiction.[194] There is an abundance of statutory support for this Court's core jurisdiction over the Insured Claims Dispute. Statutory law provides that a matter involving a Discharge Injunction is a core proceeding. The Discharge Injunction is a substantive right set out in § 524(a) of the Bankruptcy Code which describes the effect of discharge as "a discharge in a case *under this title*."[195] The Code's description of a discharge as arising under title 11 is consistent with a core classification.[196] Additionally, Title 28 provides a non-exhaustive list of core proceedings which includes "determinations as to the discharge ability of particular debts," and "objection to discharges."[197] Furthermore, courts have consistently provided that discharge injunctions are substantive rights that arise in and under title 11 and confer core

---

[192] *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 264 (3d Cir. 2007) (*quoting In re Resorts Intern., Inc.*, 372 F.3d 154, 168-69 (3d Cir. 2004)).

[193] *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 260 (3d Cir. 2007).

[194] *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 260 (3d Cir. 2007) (*citing In re Resorts Intern.*, 372 F.3d 154, 164-67 (3d Cir. 2004).

[195] 11 U.S.C. § 524 (2018) (emphasis added).

[196] 11 U.S.C. § 524 (2018).

[197] 28 U.S.C. § 157(b)(2)(I)-(J) (2005).

jurisdiction on the court.[198]  The fact that a core proceeding involves state law claims does

not necessarily "alter the core nature of a proceeding."[199]

It is abundantly clear this Court has core jurisdiction over the Insured Claims

Dispute.  It has the adjudicatory power to "[h]ear and determine and to enter appropriate

orders and judgments" pursuant to § 157(c)(2).[200]  Although this Court has core

jurisdiction over the Insured Claims Dispute, it is important for the Court to clarify a

number factual and legal errors in the Reorganized Debtors' jurisdictional analysis.

First, the Reorganized Debtors are mistaken in their belief the Insured Claims

Dispute does not qualify for related to jurisdiction because it does not "involve the

amount of property for distribution or the allocations of assets among creditors."[201]  The

fact that the Insured Claims Dispute does not meet this standard is not by itself

dispositive.

---

[198] *Ins. Co. of N. Am. v. NGC Settlement Tr. & Asbestos Claims Mgmt. Co.* (*Matter of Nat'l Gypsum Co.*), 118 F.3d 1056, 1063 (5th Cir. 1997) ("The discharge injunction granted by section 524(a) is a substantive right conferred by the Bankruptcy Code . . . ."); *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 973 (11th Cir. 2012) ("[I]f characterized as an attempt to enforce the Confirmation Order's discharge injunction, Debtors' complaint initiated a 'proceeding under title 11' . . . .") (citation omitted)); *In re Kewanee Boiler Corp.*, 270 B.R. 912 (2002) ("Proceedings to enforce the statutory injunction under § 542(a)(2) are core proceedings under 28 U.S.C. § 157(b)(2)(O), and willful violations of § 542(a)(2) are punishable or otherwise enforceable by judges using authority under § 105(a) of the Code."); *In re SelectBuild Ill., LLC*, No. 09-12085, 2015 WL 3452542, at *1 n.2 (Bankr. D. Del. May 28, 2015) (motion to enforce a plan injunction was "a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (O)"); *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016) ("Examples of proceedings arising in title 11 includes administrative matters such as . . . determining the dischargeability of debts, [and] discharges . . . .") (citation omitted).

[199] 28 U.S.C. § 157(b)(3) (2005) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."); *Crown Vill. Farm, LLC v. Arl, L.L.C.* (*In re Crown Vill. Farm, LLC*), 415 B.R. 86, 96 (Bankr. D. Del. 2009) ("Although Defendants are correct that the Adversary Proceeding involves questions of [state] law, 28 U.S.C. § 157(b)(3) establishes that the presence of issues affected by state law does not alter the core nature of a proceeding.").

[200] 28 U.S.C. § 157(c)(2) (2018).

[201] *In re Desa Holdings Corp.*, 353 B.R. 419, 425 (Bank D. Del. Bankr. 2006).

The standard by which the Reorganized Debtors evaluate the jurisdiction of this Court with respect to the Insured Claims Dispute is the standard that the Third Circuit warned was problematic when applied in a post-confirmation context. As the Third Circuit noted in *In re Resorts*, it would be "impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred."[202] It is for this reason that the Third Circuit highlights that this standard should not be applied so literally as it would entirely bar post-confirmation bankruptcy jurisdiction. Its inapplicability in the post-confirmation context is the reason why the Third Circuit developed the "close nexus" test in the first place. The Reorganized Debtors' jurisdictional standard is unreasonable and inapplicable in the post-confirmation context.

Second, caselaw generally supports a bankruptcy court's jurisdiction to interpret and enforce its own orders.[203] This jurisdiction includes the ability to enforce its confirmation orders.[204] In this case, post-confirmation jurisdiction was expressly reserved by this Court and consented to by the Parties in the Confirmation Order and in the Plan.

Paragraph 35 of the Confirmation Order states in relevant part:

---

[202] *In re Resorts Intern., Inc.*, 372 F.3d 154, 165 (Bankr. N.D. Ill. 2002).

[203] *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 (2009) ("The Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); *In re SelectBuild Ill., LLC*, No. 09-12085, 2015 WL 3452542, at *6 (Bankr. D. Del. May 28, 2015) (*citing In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del.1999)).

[204] *In re E. W. Resort Dev. V, L.P., L.L.L.P.*, 2014 WL 4537500, at *9 (Bankr. D. Del. Sept. 12, 2014) (*citing In re Almarc Corp.*, 94 B.R. 361, 365-66 (Bankr. E.D. Pa. 1988) (Bankruptcy courts retain post-confirmation jurisdiction "to protect its' conformation decree, to present interference with the execution of the plan, and to aid otherwise its operation.").

> Pursuant to section 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article X of the Plan.[205]

The Retention of Jurisdiction, Article X of the Plan, states in pertinent part:

> Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order, and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

> . . .

> (g) Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

> ....

> (i) Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

> (j) Hear and determine any rights, claims, or Causes of Action held or reserved by, or accruing to, the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code, the

---

[205] Del. Bankr. 09-13333, D.I. 534, ¶ 35.

Plan, the Confirmation Order, or, in the case of the Debtors,
any other applicable law.[206]

Nevertheless, as the Reorganized Debtors highlight, a court that is enforcing or interpreting one of its own orders, for non-core matters, may not have jurisdiction if it cannot establish a "close nexus" between the matter and the bankruptcy plan or proceeding.[207]  The Reorganized Debtors principally rely on three cases in which the Delaware Bankruptcy Court determined that it did not have jurisdiction over a particular matter.  The Reorganized Debtors draw parallels between these cases and the jurisdictional issue involving the Insured Claims Dispute in the case presently before the Court.  The cases the Reorganized Debtors rely on to support the argument that this Court lacks jurisdiction are distinguishable in three fundamental ways: (i) the parties involved, (ii) the type of law that is implicated by the dispute, and (iii) the entity that requested the assistance of the Bankruptcy Court.

First, all three cases in which the Bankruptcy Court determined that it did not have jurisdiction with respect to a particular matter involved a dispute between two non-debtors.  The Insured Claims Dispute, however, involves the Reorganized Debtors against whom the Plaintiffs seek to establish liability so that it can collect from third-party insurers.  Second, in all three cases where the Bankruptcy Court noted that it did not have jurisdiction, the underlying claims were state law questions.  In this case, however, both

---

[206] Del. Bankr. 09-13338, D.I. 355.

[207] *See Wash. Mut., Inc. v. XL Specialty Ins. Co.* (*In re Wash. Mut., Inc.*), No. 12-50422, 2012 WL 4755209 at *4 (Bankr. D. Del. Oct. 4, 2012) (*holding* that even where declaratory judgment involved the interpretation of the plan and confirmation order "[i]t is not the type of plan interpretation sufficient to confer jurisdiction, because the interpretation is not essential to the integrity of the Plan and its implementation.").

the Claim Discharge and the Insured Claims Disputes implicate federal bankruptcy law. Here, this Court is not being asked to determine state law contractual rights (*In re Thane* and *In re Washington Mutual Inc.)* or successor liability (*In re Desa*). It is only being asked to determine the applicability of the Discharge Injunction under § 542 of the Bankruptcy Code to the Plaintiffs' California Action claims.

The last fundamental difference that distinguishes this case from those cited by the Reorganized Debtors is the entity that requested the assistance of the Bankruptcy Court. The Reorganized Debtors firmly rely on *In re Desa* to demonstrate an instance in which the Bankruptcy Court strictly adhered to the request of a sister court. While the Reorganized Debtors insist the contrary, it is not true that the Delaware Superior Court directly asked for clarification from the Bankruptcy Court with respect to a lift stay issue. The litigants, and not another court, requested the assistance of the Bankruptcy Court. The scope of this request was subsequently defined by the Bankruptcy Court's interpretation of a transcript of the litigants'' oral argument before the Delaware Superior Court. The Delaware Superior Court never requested the assistance of the Bankruptcy Court. Because no formal request for clarification was ever made of the Bankruptcy Court in *Desa*, the Reorganized Debtors cannot rely on *Desa* to argue that this Court should, like the Bankruptcy Court in *Desa*, cautiously restrict itself to the request made by another court. Unlike in *Desa*, this Court received a formal request from the California Court to adjudicate the dispute between the Debtors and the creditor Plaintiffs.

The cases that the Reorganized Debtors reference in their brief do not support their argument because of the three fundamental difference highlighted above.  Unlike the cases cited, this Insured Claims Dispute involves the Reorganized Debtors, implicates federal bankruptcy law, and is the product of an actual request from another court.  These differences not only distinguish the Insured Claims Dispute from those cited by the Reorganized Debtors but also demonstrate a case that bears a closer nexus to the bankruptcy Plan and proceedings.

The Reorganized Debtors' provide no legal or equitable basis for the argument that the Insured Claims determination is time-barred.

Based on the above, this Court has jurisdiction over the Insured Claims Dispute.

**B.  The Insured Claims Dispute falls within the scope of authority defined by the California District Court's Order re: Resolution of Discharge Issue by Bankruptcy Court.**

If this Court were to render a decision on the Insured Claims Dispute, it would fall within the scope of authority defined by the California Court's *Order re: Resolution of Discharge Issue by Bankruptcy Court*.  The Reorganized Debtors are correct in highlighting that the position statement and pleadings leading up to the California Court Order do not clearly articulate the Insured Claims Dispute.  However, they are incorrect in asserting that, as a result, the Insured Claims Dispute falls outside the scope of the California Court's Order.

The Claims Discharge Dispute centers on whether the Plaintiffs can assert the California Action claims against the Reorganized Debtors.  The Insured Claims Dispute

centers on if Discharge Injunction bars the Plaintiffs from prosecuting the California Action to establish Weiand's liability in order to collect a judgment from the Reorganized Debtors' non-debtor third-party insurers.  The Insured Claims Dispute is not a dispute over an "action to determine insurance coverage on prepetition state law claims."[208]

Both disputes turn on the enforceability of Discharge Injunction on the California Action claims.  Resolution of both disputes requires an interpretation of the confirmed Plan.  This common issue situates both issues within the scope of the California Court's Order.    The Claim Discharge Dispute and the Insured Claims Dispute are not two separate issues but variations of the same issue.  The Plaintiffs failure to articulate the purpose for which a claim should be brought, while imprecise, does not sufficiently differentiate the Claim Discharge Dispute from the Insured Claims Dispute such that the latter would fall outside of the scope of the California Court's Order.

It is not within this Court's responsibility to characterize insurance policies, determine their applicability, or decide state law issues as these issues do not have a close nexus with the Weiand bankruptcy Plan or proceedings.  The California District Court only requested that this Court determine the applicability of a substantive right within the Bankruptcy Code to the California Action claims.

Based on the above, the Insured Claims Issue falls within the scope of the California Court's Order.

---

[208] D.I. 112 at 14.

## C. Section 524(a) does not prohibit recovery from a non-debtor third-party liable for the debt of the debtor.

Both statutory law and case law provide that the Plan discharge does not affect the liability of non-debtor third parties, including a debtor's insurer. Section 524(a) of the Bankruptcy Code voids any judgment, action, or recovery against the bankruptcy estate in connection with the personal liability of the debtor.[209] "Accordingly, the statutory language, on its face, does not preclude the determination of the debtor's liability upon which the damages would be owed by another party, such as the debtor's liability insurer."[210] Section 524(e) of the Bankruptcy Code explicitly provides that the discharge does not apply to non-debtors who may be liable for the debtor's debts. Collectively, § 524(a) and § 524(e) allow a creditor to recover from a third-party who may be liable for the debt of the debtor. Third Circuit case law accords with this interpretation of the statute.[211] Various Circuit Courts have also adopted this view.[212]

Section 524 has been uniformly interpreted by Circuit Courts in part because this interpretation balances the fundamental tenets of bankruptcy law and business economics. Permitting a creditor to establish debtor liability and collect the judgment from a third-party is consistent with the principle of non-intervention with the bankruptcy estate. Separating the ownership of the policy from the ownership of the

---

[209] 11 U.S.C. § 524(a) (2019).

[210] *In re Jet Fla. Sys.*, 883 F.2d 970, 973 (11th Cir. 1989).

[211] *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000); *Copelin v. Spirco, Inc.*, 182 F.3d 174 (3d Cir. 1999); *First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (Section 524(e) "assures creditors that the discharge of a debtor will not preclude them from collecting the full amount of a debt from co-debtors or other liable parties.").

[212] *In re Fernstrom Storage & Van Co.* 938 F.2d 731, 733-34 (7th Cir. 1991); *In re White Motor Credit*, 761 F.2d 270, 274-75 (6th Cir. 1985).

proceeds does not "[c]reate a personal liability of the debtor, because only the insurance company would be asked to pay anything, and hence such a suit would not infringe on the discharge."[213] This interpretation of § 524 is also consistent with the Bankruptcy Code policy of granting the debtor a fresh start.[214]

This interpretation of § 524 is also embraced by courts because it honors the contractual rights agreed to by the parties outside of bankruptcy. "When the permanent injunction is modified to permit a pending action to continue for the purpose of seeking recovery from the debtor's insurer . . . the insurer's obligation remains commensurate with the underlying insurance contract."[215] If courts did not to honor contractual rights in bankruptcy it would create unique problems. As Judge Posner points out:

> Ordinarily a liability insurance policy obligates the insurance company to pay only the sums that the insured becomes legally obligated to pay as damages. If by virtue of having been discharged from his listed debts the insured has no legal obligation to pay damages, it is not obvious where the insurance company's liability comes from.[216]

This interpretation of § 524 ensures that insurance companies cannot escape their contractual obligations as a result of a bankruptcy filing; it also ensures that they cannot be prejudiced by it.

---

[213] *Matter of Hendrix*, 986 F.2d 195, 197 (7th Cir. 1993) (citation omitted).

[214] *In re Jet Fla. Sys.*, 883 F.2d 970, 974 (11th Cir. 1989) (*citing In re Mann*, 58 B.R. 953, 958 (Bankr. W.D. Va. 1986)).

[215] *In re Jet Fla. Sys.*, 883 F.2d 970, 975 (11th Cir. 1989).

[216] *Matter of Hendrix*, 986 F.2d 195, 200 (7th Cir. 1993).

Statutory law and case law uniformly provide that § 524(a) and § 524(e) allow a creditor to recover from a third-party who may be liable for the debt of the debtor. The Reorganized Debtors have not challenged this interpretation of § 524. Additionally, the Reorganized Debtors have not provided any indication that any of the underlying policy interests that support this interpretation will be frustrated by the Plaintiffs' suit.

For the above reasons, the Court will grant summary judgment in favor of the Plaintiffs on the Insured Claims Dispute.

## CONCLUSION

In sum, the Court will deny both the Claim Discharge Motion and the Claim Discharge Cross Motion. There are genuine issues of material fact as to when the California Action claims arose. These factual issues exist with respect to both the CERCLA and the California state law claims.

With respect to the issue of notice, the record is insufficient for the Court to determine if the Reorganized Debtors, outside of the books and records, had knowledge of actual injury to the Plaintiffs such that the Plaintiffs could have been classified as known creditors during the Bankruptcy. The record is also insufficient for the Court to determine the adequacy of the Debtors' publication notice.

Finally, the Court will grant the Plaintiffs' Insured Claims Motion. This Court has core jurisdiction to decide the issue, which falls within the California Court's request. Pursuant to § 524(e) the Plaintiffs are not barred from establishing the liability of the

Reorganized Debtors for the purpose of collecting from non-debtor third party insurance companies.  An order will be issued.