# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WEIAND AUTOMOTIVE, INC., | Case No. 09-13338 (TMH) |
| Reorganized Debtor. | |

# OPINION

The issue before the Court is whether the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and California state law claims the Mehrabian Family Trust ("MFT") assert in their action against debtor Weiand Automotive, Inc. (hereinafter, "Weiand Automotive") in the United States District Court for the Central District of California (the "California Action") were discharged by the plan confirmation order (the "Confirmation Order") entered on June 7, 2010. In resolving this issue, the first question to answer is whether these CERCLA and state law claims accrued prepetition, pre-confirmation, or post-confirmation. The second question then is, if the claims accrued prepetition or pre-confirmation, whether notice was properly given to MFT.

The Court finds that the CERCLA claims did not accrue prepetition and, thus, the Confirmation Order had no effect on those claims. However, the state law claims accrued prepetition and, thus, were subject to the Confirmation Order. Further, the publication notice the Debtors gave in *USA Today* was sufficient to

notify MFT of the proof of claim bar date. Therefore, the California state law claims were discharged by the Confirmation Order, but the CERCLA claims were not.

I.    <u>Jurisdiction</u>

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(I)–(J), and venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.[1] The Court has the judicial authority to enter a final order.

II.   <u>Background</u>

A.    <u>Background on the Soil Vapor and Groundwater Contamination</u>

Weiand Automotive operated a machine shop at 2316-24 North San Fernando Road (the "Weiand Site") from 1975 through 1986.[2] During this time, Weiand Automotive operated a degreaser on the Weiand Site. The degreaser used perchloroethylene ("PCE") and disposed of it in the ground, contaminating the soil vapor and groundwater there.[3] This PCE contamination migrated from the Weiand Site to neighboring properties.[4] This contamination migration first garnered public attention in 1999 when Union Pacific Railroad Company, the owner of the adjacent Taylor Yard Property (the "Taylor Yard"), sued Weiand Automotive, claiming that

---

[1] 28 U.S.C. §§ 1334(b), 157(b)(2)(I)–(J), 1408–09.
[2] Post-Trial A[n]swering Brief of the Mehrabian Family Trust and CA Auto Maty Group, Inc. (the "<u>MFT Post-Trial Br.</u>") 2 [D.I. 228].
[3] <u>Id.</u> at 1.
[4] <u>Id.</u> at 2.

PCE had migrated south into its property from the Weiand Site (hereinafter, the "Union Pacific Litigation").[5]

Union Pacific sued not only Weiand Automotive but also the owner of another neighboring property, Profile Plastics.[6] However, Union Pacific did not sue MFT, which owned the property situated directly between the Weiand Site and the property owned by Profile Plastics (the "MFT Property").[7] In fact, there were no allegations made and no soil or groundwater samples that would suggest the MFT Property was contaminated or that any contamination on the Property was migrating elsewhere.[8]

Despite this, on August 28, 2000, Weiand Automotive filed a third-party complaint against Onnik Mehrabian and his wife, in their capacities as individuals and as owners of the MFT Property, seeking contribution and indemnification for potential claims by Union Pacific relating to cleanup costs for the Taylor Yard to the extent that MFT had any responsibility for the contamination.[9] However, before service of this third-party complaint on MFT, the parties in the Union Pacific

---

[5] Id.
[6] See Joint Ex. 6A, Union Pacific Railroad Company v. Weiand Automotive Industries, Inc. Settlement [the "Settlement Order"].
[7] Id.
[8] Joint Ex. 6A.
[9] Joint Ex. 6B, Union Pacific Railroad Company v. Weiand Automotive Industries, Inc., et al. Notice of Motion and Joint Motion by Joan Weiand, Frederick Wade, Weiand Automotive Industries, Inc. and Holley Performance Products, Inc. for an Order Approving Settlement and Barring Contribution and/or Indemnity Claims Against Settling Defendants; Memorandum of Points and Authorities; Declaration of Michael R. Leslie; Exhibit.

Litigation reached a settlement.[10] In the settlement, Weiand Automotive sought contribution protection from MFT, and it served the motion and order approving the settlement upon the Mehrabians.[11]

Under the settlement, Weiand Automotive entered into a Voluntary Cleanup Agreement pursuant to which Weiand would identify the soil and groundwater contamination for which it was responsible and then provide and implement a Removal Action Workplan for that contamination.[12] These tasks were to be overseen by the California Department of Toxic Substances Control (the "DTSC").[13]

Weiand completed the Removal Action Workplan in 2003, and, while the exact extent of the contaminated soil was yet unidentified, the target for removal was a 25-foot radius from the site of the degreaser.[14] Under this Removal Action Workplan, Weiand conducted remediation operations from 2005 through 2009, at which point DTSC determined that soil vapor concentrations had stabilized. However, no groundwater samples had been collected at the time, and, on September 1, 2009, DTSC urged the Weiand Parties to assess the groundwater impact of the PCE contamination at that time.[15]

Before taking any such groundwater samples, on September 28, 2009, Weiand Automotive Industries and its affiliates (collectively, the "Debtors") filed

---

[10] Id.
[11] Joint Ex. 6A; Joint Ex. 6B, Proof of Service.
[12] Joint Ex. 6B, at 7-8; Joint Ex. 64, Voluntary Cleanup Agreement Ex. C, at 1–2.
[13] Joint Ex. 64, at 5 § 3.1.
[14] Joint Ex. 65, Removal Action Workplan for Weiand Automotive Property 3-2.
[15] MFT Pretrial Br. 11.

voluntary petitions for relief with this Court under chapter 11.[16] The Debtors'

Debtors' Modified Amended Plan of Reorganization (the "Plan") was confirmed on

June 7, 2010 and went effective on June 22, 2010.[17]

In 2014, MFT conducted PCE testing of the MFT Property and the Weiand

Site, which MFT was leasing in connection with the Kia dealership MFT operated

on the MFT Property.[18] The sampling involved five subsurface testing sites on the

Weiand Site and two on the MFT Property.[19] The tests revealed that PCE levels on

the MFT Property were six times the state and federal drinking water standards,

standards which also served as the cleanup standards for contaminated sites.[20]

In 2017, MFT conducted soil vapor testing at the MFT Property, which

further confirmed that contamination was migrating from the Weiand Site onto the

MFT Property.[21] These 2014 and 2017 samples were the only ones ever taken from

the MFT Property.[22]

On March 20, 2015, MFT and CA Auto Mart Group, Inc. (together, the

"Plaintiffs") filed a complaint against Joan Weiand, the Joan F. Weiand Trust, and

Weiand Automotive (together, the "Defendants") in the United States District Court

---

[16] Chapter 11 Voluntary Petition [D.I. 1].
[17] Debtors' Modified Amended Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code (the "Plan"), In re Holley Performance Prods. Inc., Case No. 09-
13333 (KJC) (Bankr. D. Del. June 3, 2010) [D.I. 519].
[18] Joint Ex. 4, Wells Expert Report (the "Wells Report") 5.
[19] Id.
[20] Id.
[21] Id. at 7–8.
[22] Id.

for the Central District of California (the "California Action").[23] There, the Plaintiffs alleged that hazardous substances including PCE were released onto the Weiand Site, which was owned at all relevant times by the Defendants, and migrated from the Weiand Site toward the neighboring property owned by MFT.[24] The Plaintiffs asserted claims under CERCLA and various California state laws.[25]

### B.    Background on Notice Issue

When the Debtors filed their bankruptcy cases in 2009, Stephen Trussell, the Debtors' then-Vice President of Finance, prepared their schedules and creditor matrix.[26] The Debtors purported to make reasonable efforts to ensure that these documents were complete and accurate based on the information available to them.[27]

Among the categories of potential creditors identified were litigation and environmental creditors.[28] The Debtors then reviewed their books and records, including their litigation and environmental records, to identify those creditors who fell into each category.[29] As a result of this review, the Debtors identified Joan Weiand and DTSC as creditors, but they did not include MFT or the Mehrabians individually as creditors on the creditor matrix or schedules.[30]

---

[23] Complaint, Mehrabian Fam. Tr. v. Weiand, Case No. 2:15-cv-02105 (C.D. Cal.) [D.I. 1].

[24] Id.

[25] Id.

[26] Joint Ex. 44, Trussell Declaration (the "Trussell Decl.") ¶ 4.b.

[27] Id.

[28] Id. ¶ 5.

[29] Id.

[30] Id. at ¶¶ 8–9.

On December 2, 2009, this Court established February 1, 2010 as the bar date to file claims.[31] Ahead of the bar date, the Debtors mailed notice to all parties they had identified as creditors.[32] The Debtors did not include MFT or CA Auto Mart on these lists of creditors who received notice by mail.[33] Additionally, the Debtors published notice of the bar date in *USA Today* on December 17, 2009.[34]

This Court ultimately held a plan confirmation hearing on June 7, 2010, and entered the order confirming the plan that same day.[35] The Debtors did not serve mailed notice of the Plan on MFT.[36] On February 24, 2012, the Court entered a final decree closing the bankruptcy cases.[37]

C.     Procedural History

On July 2, 2015, the Defendants in the California Action moved to dismiss the state law claims asserting, among other reasons, that that the Confirmation

---

[31] Order (A) Establishing Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner of Notice Thereof, and (C) Authorizing Payment of Related Publication Expenses, In re Holley Performance Prods. Inc., Case No. 09-13333 (KJC) (Bankr. D. Del. Dec. 2, 2009) [D.I. 195].

[32] Reorganized Debtors' Pre-Trial Brief (the "Debtors' Pretrial Br.") 15 (Dec. 20, 2024) [D.I. 208].

[33] Id.

[34] Notice of Certificate/Affidavit of Publication of Bar Dates for Filing of Claims at 1, In re Holley Performance Prods. Inc., Case No. 09-13333 (KJC) (Bankr. D. Del. Dec. 23, 2009) [D.I. 243].

[35] Plan; Findings of Fact, Conclusions of Law, And Order Confirming the Debtors' Amended Plan o[f] Reorganization, In re Holley Performance Prods. Inc., Case No. 09-13333 (KJC) (Bankr. D. Del. June 7, 2010) [D.I. 534].

[36] Trussell Decl. ¶¶ 8–9.

[37] Final Decree Closing the Chapter 11 Case of Each Reorganized Debtor, In re Holley Performance Prods. Inc., Case No. 09-13333 (KJC) (Feb. 24, 2012) [D.I. 770].

Order discharged the claims.[38] At the same time, the Defendants also moved this Court to reopen the bankruptcy case to seek a determination that the claims in the California Action were barred.[39]

On September 11, 2015, the California Court granted the Defendant's motion to dismiss in part and denied it in part, and, in 2017, it entered an order finding that the appropriate course of action was for this Court to resolve the issue of whether the claims in the California Action were discharged by the Confirmation Order.[40] The California Court then stayed its proceedings until this Court made its determination.[41]

This Court reopened this case on April 6, 2017, for the limited purpose of determining whether the confirmation of the Plan discharged the claims in the California Action by the bar date established in the Bankruptcy Cases.[42] The

---

[38] Notice of Motion and Motion to Dismiss Case Pursuant to Fed. R. Civ. Proc. 12(b)(6), Mehrabian Fam. Tr. v. Weiand, Case No. 2:15-cv-02105 (C.D. Cal.) [D.I. 39]; Memorandum in Support of Notice of Motion and Motion to Dismiss Case Pursuant to Fed. R. Civ. Proc. 12(b)(6), Mehrabian Fam. Tr. v. Weiand, Case No. 2:15-cv-02105 (C.D. Cal.) [D.I. 40].

[39] Motion of Reorganized Debtors for Entry of an Order Temporarily Reopening the Case of Weiand Automotive Industries, Inc. to Enforce the Confirmation Order and Discharges and Injunctions against Plaintiffs Mehrabian Family Trust and CA Auto Mart Group, Inc., In re Holley Performance Products Inc., Case No. 09-13333 (KJC) (Bankr. D. Del. July 2, 2015) [D.I. 778].

[40] Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Mehrabian Fam. Tr. v. Weiand, Case No. 2:15-cv-02105 (C.D. Cal.) [D.I. 54]; Order Re: Resolution of Discharge Issue by Bankruptcy Court, Mehrabian Fam. Tr. v. Weiand, Case No. 2:15-cv-02105 (C.D. Cal.) [D.I. 70].

[41] Order Granting in Part Stipulation to Stay Case, Mehrabian Fam. Tr. v. Weiand, Case No. 2:15-cv-02105 (C.D. Cal.) [D.I. 58].

[42] Order (I) Reopening Chapter 11 Case for the Limited Purpose of Adjudicating the Claim Discharge Dispute and (II) Approving Stipulation Governing Case Schedule [D.I. 9].

parties then engaged in extensive discovery that included lengthy depositions and an exchange of expert reports, with the Defendants using Sam Williams, a VP and Hydrogeologist at Geosyntec Consultants, Inc. and the Plaintiffs using Dr. James T. Wells, Ph.D.[43] In 2016 and in 2018 through 2019,  the parties pursued mediation regarding this dispute, but each attempt was ultimately unsuccessful.[44]

In 2019, both parties moved for summary judgement, and, on February 25, 2020, this Court issued an opinion denying both motions, finding that there were issues of material fact that needed to be resolved.[45] Following a lengthy period of inactivity, the case then closed again on March 21, 2022. The Debtors responded by filing a motion to reopen case, which the Court granted on June 8, 2022.[46]

After this second reopening of the case, the parties collaborated on and the Court assisted in crafting a pretrial schedule, and the Court ultimately scheduled a trial.[47]

The parties resumed discovery, and they exchanged a second set of expert reports.[48] The Plaintiffs again used Dr. Wells as their expert, while the Defendants used Robert Ettinger, a Senior Principal Environmental Scientist with Geosyntec.[49]

---

[43] Joint Ex. 3D, Roux Report 3; Wells Report.
[44] Debtors' Pre-Trial Br. 5.
[45] Motion For Summary Judgment [D.I. 90]; Cross Motion For Summary Judgment [D.I. 108]; In re Weiand Auto. Indus., 612 B.R. 824 (Bankr. D. Del. Feb 25, 2020).
[46] Debtors' Pre-trial Br. 6.
[47] Further Amended Case Scheduling Order [D.I. 192].
[48] Debtors' Pre-trial Br. at 6.
[49] Wells Report; Joint Ex. 22, Ettinger Expert Report.

The Parties submitted the proposed pretrial order on December 4, 2024, and trial was held from January 14 through 16, 2025.[50] During the trial, the Plaintiffs called Mr. Mehrabian to testify about his awareness of any potential contamination on the MFT Property prior to the Confirmation Order.[51] They also called Dr. Wells as their expert witness.[52] The Defendants called Mr. Trussell to testify about his review of Weiand's books and records for the purposes of the notice issue. They also called Mr. Ettinger as their expert witness.[53]

After the conclusion of the trial, the parties submitted post-trial briefing.[54]

III.    Argument

    A.    Using the Frenville test, the CERCLA claims accrued post-petition while the California state law claims accrued prepetition.

Under In re Frenville Co., Inc., a bankruptcy claim arises at the time that the cause of action under non-bankruptcy law accrues.[55] Here, the Plaintiffs assert claims under CERCLA and California state law. CERCLA and the applicable

---

[50] Notice of Agreed Final Pre-Trial Order [D.I. 203].

[51] Jan. 14 Tr. 7:1–132:4.

[52] Jan. 14 Tr. 135:11–89:11; Jan. 15 Tr. 4:8–107:2.

[53] Jan. 16 Tr. 85:24–122:17; 62–84:24; Jan. 15 Tr. 108:24–189:4.

[54] Reorganized Debtors' Post-Trial Brief (the "Debtors' Post-Trial Br."), [D.I. 227]; MFT Post-Trial Br.; Reorganized Debtors' Post-Trial Reply Brief (the "Debtors' Post-Trial Reply") [D. I. 229].

[55] In re Frenville Co., Inc., 744 F.2d 332 (3d Cir. 1984); Wright v. Owens Corning, 679 F.3d 101 (3d Cir. 2012). Though the Third Circuit overturned its decision in Frenville through its ruling in In re Grossman's Inc., 607 F.3d 214 (3d Cir. 2010), it later decided in Wright that "[d]ue process requires that the outcome of the Frenville test [would] continue to apply to[] claims in bankruptcy cases[, like the case here,] where reorganization are proposed and confirmed prior to the date of the [Grossman's] decision." Wright v. Owens Corning, 679 F.3d at 109.

California state laws each have their own rules governing when a cause of action

accrues and, thus, the Court will analyze the claims under <u>Frenville</u> separately.

> 1. <u>The California state law claims accrued prepetition because MFT knew or reasonably should have known that contamination could have spread to from the Weiand Site to the MFT Property, and an investigation would have revealed the migration of the PCE.</u>

Under California law, a tort cause of action accrues when the wrongful act is

done, not when a plaintiff discovers the wrongful act.[56] However, under CERCLA

section 309's discovery rule, which preempts any conflicting state statute of

limitations, the accrual of the cause of action is fixed at the moment when the

"plaintiff discovers, or reasonably should have discovered, that the harm in question

was caused by the contaminant."[57]

Under this discovery rule, courts use a two-part test in determining when the

cause of action would have accrued.[58] The first consideration is whether a

reasonable person in the plaintiff's situation would be expected to inquire about the

cause of their injury.[59]  Assuming that a reasonable person would be on inquiry

notice regarding their injury, the second consideration then becomes whether an

inquiry "would have disclosed the nature and cause of [the] plaintiff's injury so as to

put him on notice of his claim."[60]

---

[56] <u>Moreno v. Sanchez</u>, 106 Cal. App. 4th 1415, 1423 (2003) (citing <u>Neel v. Magana, Olney, Levy, Cathcart & Gelfand</u>, 491 P.2d 421, 428 (Cal. 1971)).
[57] 42 U.S.C. § 9658; <u>CTSP Corp. v. Waldburger</u>, 573 U.S. 1, 4 (2014); <u>See also</u> <u>O'Connor v. Boeing N. Am., Inc.</u>, 311 F.3d 1139, 1147 (9th Cir. 2002).
[58] <u>See O'Connor</u>, 311 F.3d at 1150.
[59] <u>Id.</u>
[60] <u>Id.</u>

a. <u>MFT was put on inquiry notice of the contamination on the Weiand Site.</u>

i. <u>The Plaintiffs were put on inquiry notice of contamination migration to its property because they had actual knowledge of contamination at the Weiand Site.</u>

Testimony from Mr. Mehrabian at trial revealed that the Plaintiffs had actual knowledge of the Weiand Site's contamination prior to the September 28, 2009 petition date.

In 2003, CA Auto Mart leased the Weiand Site for use as a part of the MFT's Kia dealership.[61] In that 2003 lease agreement, there were references to the remediation efforts and the soil and groundwater contamination.[62] Mr. Mehrabian signed this agreement and even initialed on the page where the language concerning the remediation appears.[63] Mr. Mehrabian also testified that, in compliance with the remediation provision of the lease, he would, for example, move his parked cars from the Weiand Site in order to make room for the remediation efforts.[64]

Not only did he lease the Weiand Site in 2003, but he later took efforts to purchase it in 2005.[65] As part of those efforts, he engaged counsel to appraise the

---

[61] Joint Ex. 3B, 2003 Lease Agreement.
[62] <u>Id.</u>
[63] <u>Id.</u>
[64] Jan. 14 Tr. 35:11–14, 116:16–18.
[65] Joint Ex. 11, July 6, 2007 Letter from Robert Philibosian to Onnik Mehrabian enclosing appraisal 005, 008; Jan. 14 Tr. 40:2–41:2.

Weiand Site.[66] His attorney sent Mr. Mehrabian the appraisal in 2007.[67] In the appraisal, counsel stated that the Weiand Site was "contaminated by hazardous substances requiring costly cleanup" and was "affected by hazardous or toxic wastes."[68] Mr. Mehrabian testified that, because of this language in the Appraisal, he was aware of the contamination on the Weiand Site by 2007.[69]

Moreover, in his efforts to purchase the Weiand Site, Mr. Mehrabian sent letters to Joan Weiand in 2006 and 2007.[70] These letters, which he signed, acknowledged the contamination on the Site, with one stating that his dealership would not "adversely impact the environment as did the former industrial and manufacturing uses by Weiand Industries which have been held by a federal court to constitute a major co-source of dangerous pollutants."[71] These letters not only acknowledged the contamination but also recognized the remediation efforts at the Site, with one such letter noting that, "a major environmental remediation/mitigation effort is still being conducted on these premises…"[72]

Finally, prior to the petition date, a bank conducted a Phase I environmental assessment on the MFT Property in connection with a refinancing, and, as a part of this assessment, Mr. Mehrabian was interviewed.[73] In this interview, he stated that

---

[66] Joint Ex. 11.
[67] Joint Ex. 11.
[68] Joint Ex. 11.
[69] Jan. 14 Tr. 44:5–9, 109:5–6.
[70] Joint Ex. 13; Joint Ex. 14; Joint Ex. 15.
[71] Joint Ex. 13, at 002.
[72] Id.
[73] Joint Ex. 3J, 2008 Phase I Environmental Site Assessment 18.

he "was aware of the ongoing remediation on the adjoining property to the north [i.e., the Weiand Site]".[74] The assessment found that there was "visible evidence of recognized environmental conditions in connection with the [Weiand Site and Taylor Yard] that would lead to contamination of the [MFT Property]" including "remediation equipments at the adjoining property to the north [i.e., the Weiand Site]."[75]

ii.   <u>The Plaintiffs were put on inquiry notice because the contamination and subsequent remediation on the Weiand Site was visible from the MFT Property.</u>

During the trial, Mr. Mehrabian testified that he was aware of the remedial efforts occurring at the neighboring properties like the Taylor Yard because of the sight and sound of the machinery and removal efforts.[76] He was aware that there were engineers and staff from DTSC visiting the Weiand Site to drill and cap drilled holes as part of the remediation efforts.[77] Further, the Debtor's expert, Mr. Ettinger, testified that the removal and remediation machinery would be large and noisy and that there would be hundreds of trucks moving thousands of cubic yards of soil from the property.[78] The property's commercial uses as a drycleaner and auto repair shop, the operations of which both would have involved potentially hazardous chemicals such as PCE, would have further clued in neighboring property owners to

---

[74] <u>Id.</u>
[75] <u>Id.</u>
[76] Jan. 14 Tr. 47:3–11, 47:16–48:7, 77:6–9.
[77] <u>Id.</u> at 35:19–36:8.
[78] Jan. 15 Tr. 148:23–149:2.

the contamination on the Weiand Site and the potential spread of that

contamination to adjacent properties.[79]

> iii.   Mr. Mehrabian's testimony at trial further
> reveals that he was aware of contamination on
> the neighboring Weiand Site and Taylor Yard.

Not only did Mr. Mehrabian become aware of remediation on neighboring

properties due to its visibility from the MFT Property, but his testimony and the

evidentiary record also reveals he was otherwise aware of this nearby remediation.

He testified at trial that he knew of the Union Pacific Litigation and had even

attended a hearing in the litigation.[80] He further confirmed in his testimony that he

was aware of the remediation efforts occurring on the Taylor Yard Property when

he acknowledged the letter he sent to Joan Weiand in which he stated that Weiand

Automotive was a source of dangerous pollutants that had contaminated the Taylor

Yard.[81]

Moreover, Mr. Mehrabian had received the public participation plan for the

Taylor Yard Property, which was intended to "inform the public of the work that[

was] being done to address environmental issues [there]."[82] This, coupled with the

fact that MFT received the motion to approve the settlement agreement and the

settlement order in the Union Pacific Litigation, shows that, not only would MFT

had been aware of the contamination on both the Weiand Site and the Taylor Yard,

---

[79] Id. at 163:13–164:14.
[80] See Jan. 14 Tr., at 48:10–13.
[81] See id. at 5:11–16, 46:24–47:6; see also Joint Ex. 13, at 002; Joint Ex. 14, at 002.
[82] See Jan. 14 Tr. 146:5–8, 147:10–11, 147:24; see also Joint Ex. 3N, Public
Participation Plan for the Southern Pacific Taylor Yard Site.

it would have also known the contamination had migrated from the Weiand Site
onto the Taylor Yard.

Taken together, Mr. Mehrabian's multiple written acknowledgements of the
contamination, his testimony at trial, and the visibility of the remediation work
from the MFT Property, the Court concludes that the Plaintiffs knew (or reasonably
should have known) that there was contamination on the Weiand Site that should
have put them on inquiry notice of potential contamination on the MFT Property.

> b. <u>An investigation would have revealed the nature and
> cause of the contamination of the MFT Property.</u>

Having established that the Plaintiffs were on notice regarding the Weiand
Site's contamination and the migration of PCE, the next question to answer is
whether an investigation would have revealed the existence of the contamination on
the MFT Property.

Evidence presented at trial reveals that PCE contamination in both the soil
and groundwater would have migrated from the Weiand Site onto the MFT
Property prior to the petition date. Of the two experts who testified at trial, only
Mr. Ettinger offered a concrete opinion as to whether the contamination had
migrated prior to 2009.[83] Dr. Wells, MFT's expert, testified that the contamination
"certainly must have arrived sometime before 2014," when testing was first
completed on the MFT Property, but he offered no opinion as to whether
contamination would have been present prior to 2010, when the Plan was

---

[83] Jan. 15 Tr. 120:15–16.

confirmed, or earlier.[84] Mr. Ettinger, meanwhile, concluded that, based on the

plume diagrams, the ERM Report from 2000, and all information available, there

would have been groundwater and soil vapor PCE migration onto the MFT Property

as early as 1999.[85]

Further, Mr. Ettinger testified that the contour lines on the 2000 plume

diagram could be interpreted to suggest that the MFT Property had groundwater

concentrations of PCE well over 100 micrograms.[86] He also clarified that, even

though, on this particular plume, groundwater would be expected to flow directly

south from the Weiand Site rather than southeast in the direction of the MFT

Property, there is other data to suggest that groundwater can and did flow from

north and northwest onto the MFT Property in the southeast.[87] He noted that

"there can be some variations in groundwater flow direction and that will cause the

plume to spread out so the plume does not travel in that straight line[;]…it will

disperse and just like you see emissions from a smokestack, they kind of disperse

out."[88] Based on this explanation, Mr. Ettinger concluded that the groundwater

contamination would have been present on the MFT Property as early as 1999.[89]

Dr. Wells did not explicitly acknowledge the presence of contamination prior to

---

[84] Id. at 5:10; Reorganized Debtor Ex. 1, Reorganized Debtors' Demonstrative –
Highlighted Version of Plume Diagram.
[85] See Jan. 15 Tr. 127:11–132:10, 135:18–137:3.
[86] Id. at 131:2–4.
[87] Id. at 135:18–137:3.
[88] Jan. 16 Tr. 74:16–19.
[89] See Jan. 15 Tr. 131:11–14.

2014, but he too noted that the contamination coming from the Weiand Site had "continued, uncharacterized and unabated for at least 15 years."[90]

Thus, though no testing was conducted at the MFT Property prior to 2014, the expert testimony at trial and the rest of the evidentiary record available to the Court show that an investigation would have revealed that the PCE contamination on the Weiand Site migrated onto the MFT Property prior to the petition date. Therefore, the state law claims accrued prepetition. Because the state law claims accrued prepetition, they are subject to the discharge provisions of the Confirmation Order.

> 2.  <u>The CERCLA Claims arose post-petition because, based on the evidentiary record before the Court, MFT did not incur response costs under CERCLA.</u>

This Court already has found that a CERCLA claim "accrues when a plaintiff incurs necessary response costs in connection with the release of hazardous materials."[91] Unlike the California state law claims, there is no "knowledge" consideration for when a CERCLA claim accrues.[92] Thus, even though MFT knew or reasonably should have known of the contamination migration from the Weiand Site onto the MFT Property, that knowledge is not relevant to the accrual

---

[90] Jan. 15 Tr. 31:17–32:24; <u>see</u> <u>also</u> Joint Ex. 83, Site Report of L. Everett & Associates, LLC at 013.

[91] <u>In re Weiand Automotive Indus.</u>, 612 B.R. 824, 841 (Bankr. D. Del. 2020) (denying summary judgment because there remained a genuine issue of material fact preventing the court from determining when responses costs were incurred); <u>accord</u> <u>In re Allegheny Int'l, Inc.</u>, 126 B.R. 919, 925 (W.D. Pa. 1991), <u>aff'd sub nom.</u>, <u>Allegheny Int'l, Inc. v. AL Tech Specialty Steel Corp.</u>, 950 F.2d 721 (3d Cir. 1991).

[92] <u>In re Allegheny Int'l, Inc.</u>, 126 B.R. 919, 925 (W.D. Pa. 1991), <u>aff'd sub nom.</u>, <u>Allegheny Int'l, Inc. v. AL Tech Specialty Steel Corp.</u>, 950 F.2d 721 (3d Cir. 1991).

determination under CERCLA. Only the timing of when MFT incurred response costs is at issue.[93]

Under CERCLA section 107, "a cause of action . . . accrues when a plaintiff incurs necessary response costs in connection with the release of hazardous materials . . . .The cause of action accrues at the first moment that a Plaintiff's money is spent."[94] Specifically, a cause of action accrues under CERCLA when "(1) . . . the site under consideration is a 'facility'; (2) . . . there has been a release of a hazardous substance at the site; (3) . . . the release caused the plaintiff to incur costs responding to the release of the hazardous substance; and (4) . . . the alleged tortfeasor . . . falls under the category of a 'potentially responsible party.'"[95]

Here, elements (1), (2), and (4) are not at issue, as the parties agree that the Weiand Site was a "site" under CERCLA's definition, that the Weiand Site released hazardous materials, and that Weiand is a "potentially responsible party."[96] The only element at issue is (3), whether MFT incurred any prepetition response costs as a result of the contamination that spread from the Weiand Site to the MFT Property.

---

[93] Id.

[94] In re Weiand Auto. Indus., 612 B.R. at 841 (citing In re Allegheny Int'l, Inc., 126 B.R. 919, 925 (W.D. Pa. 1991), aff'd sub nom., Allegheny Int'l, Inc. v. AL Tech Specialty Steel Corp., 950 F.2d 721 (3d Cir. 1991)).

[95] JFE Steel Corp. v. ICI Ams., Inc., 797 F. Supp. 2d 452, 461 (D. Del. 2011).

[96] Pretrial Brief of the Mehrabian Family Trust and CA Auto Mart Group, Inc. (the "MFT Pretrial Brief") 16–17 [D.I. 207]; Debtors' Pre-trial Br. 38–39.

A "response" under CERCLA means "remove, removal, remedy, and remedial action" and "include[s] enforcement activities related thereto."[97] In turn, "'remove' or 'removal' means…such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances . . . ."[98] "'[R]emedy' or 'remedial action' means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances . . . ."[99]

This definition encompasses certain actions that fall within its meaning, but these examples are not exhaustive, and the terms themselves are meant to be construed broadly.[100] Though the word "investigate" is not mentioned in these definitions, the Third Circuit has found that investigative efforts into contamination can be "responses" and, thus, any compensation paid for such efforts would then be "response costs."[101]

The Debtor argues that MFT incurred response costs when Mr. Mehrabian employed Ken Dixon in 2006 and 2007 to prepare letters to Joan Weiand detailing environmental contamination potentially migrating from the Site onto neighboring

---

[97] 42 U.S.C. § 9601(25).
[98] 42 U.S.C. § 9601(23).
[99] 42 U.S.C. § 9601(24).
[100] <u>Trinity Indus. v. Greenlease Holding Co.</u>, 903 F.3d 333, 353 (3d Cir. 2018).
[101] <u>Id.</u>

land like the MFT Property.[102] The Debtors claim these letters identify Weiand as a potentially responsible party due to language such as, "we have both already expended substantial funds to make this property attractive, or environmentally safe…"[103] There is case law to suggest that the compensation for work identifying potentially responsible parties is a response cost, as this is a kind of "investigation" into the existence of and source of the contamination.[104]

The only case the Debtor cites for support is the Supreme Court's 1960 decision in Key Tronic Corp. v. United States. The Supreme Court held that fees related to Key Tronic's work identifying potentially responsible parties were recoverable under CERCLA. They found that, even though certain work is not officially removal or cleanup, it is so "closely tied to the actual cleanup [that it] may constitute a necessary cost of response in and of itself…"[105] There, the investigation involved an extensive search for potentially responsible parties, efforts that aided in "uncovering the Air Force's disposal of wastes at the site and in prompting the EPA to initiate its enforcement action against the Air Force."[106] Further, the Supreme Court found that such an investigation "increase[d] the probability that a cleanup

---

[102] Joint Ex. 13, October 5, 2006 Letter from Onnik Mehrabian to Joan Weiand re Leased Premises; Joint Ex. 14, November 1, 2006 Letter from Onnik Mehrabian to Joan Weiand re: Leased Premises; Joint Ex. 15, December 16, 2006 Letter from Onnik Mehrabian to Joan Weiand re: Problems with Leased Premises.
[103] Joint Ex. 13, at 1.
[104] Key Tronic Corp. v. United States, 511 U.S. 809, 819–20 (1994).
[105] Id. at 820.
[106] Id.

[would] be effective and get paid for…[,] benefited the entire cleanup effort[,] and served a statutory purpose apart from the reallocation of costs."[107]

Here, the letters Mr. Dixon wrote to Joan Weiand on behalf of Mr. Mehrabian are analogous to the investigation in <u>Key Tronic</u> in neither intent nor impact. While the letters do begin with an acknowledgement of the contamination at the Weiand Site, this exists as a mere framing device for the main purpose of the letter: Mr. Mehrabian obtaining a long-term lease or a purchase of the Weiand Site from Joan Weiand.[108] He mentions the contamination as justification for his belief that the property would be best tended to under his control; he testified to as much at trial.[109]

Not only did Mr. Mehrabian not evidence any intent to identify the Debtors as potentially responsible parties for CERLA purposes through his letters, but these letters did not further cleanup efforts or benefit the remediation process in any way. Everything stated in these letters regarding contamination was already public information because of the Union Pacific Litigation, the Voluntary Cleanup Agreement, the Removal Action Workplan, and the implementation of those remediation action plans.[110] There is nothing in the record to suggest that the letters affected remediation or government action at all.[111] Thus, the letters did not actually aid in identifying the Debtors as potentially responsible parties, as that

---

[107] <u>Id.</u>
[108] Joint Ex. 13; Joint Ex. 14; Joint Ex. 15.
[109] Jan. 14 Tr. 67:10 – 69:1; 104:5-14; 121:13 – 122:7.
[110] Joint Ex. 6A; Joint Ex. 64; Joint Ex. 65.
[111] Joint Ex. 13; Joint Ex. 14; Joint Ex. 15.

identification had already been made, and, given that the letters also did not help facilitate cleanup efforts, the costs Mr. Mehrabian incurred in hiring Mr. Dixon to write the letters cannot be said to be response costs.

The Debtors also argue that the Plaintiffs incurred prepetition response costs associated with the 2008 Phase I report. In their Post-Trial Reply Brief, they claim that MFT engaged Pacific Commerce Bank as a lender to finance the Phase I report but that the ultimate cost of the report would fall to MFT.[112] However, no evidence in the record that supports this contention. The Debtors attempted to slip in a letter of intent as new evidence in their post-trial brief.[113] However, because the Debtor did not move to reopen the record, and instead simply attached this new "evidence" to its post-trial brief without disclosing that it was not a part of the evidentiary record, the Court found that it would not consider this letter of intent in its determination.[114] Given the evidence that is in the record, then, there is nothing to suggest that MFT was the party to incur the response costs for the Phase I report.

Therefore, given the absence of evidence regarding MFT's responsibility for these response costs, the Court finds that the response costs related to the 2009 Phase I Report were not MFT's. MFT's earliest response costs, as reflected in the record, concern the 2014 MFT Property sampling and testing. This testing occurred well after both the petition date and the confirmation of the Plan. Thus, MFT accrued response costs post-petition and post-confirmation, and, as such, MFT's

---

[112] Reorganized Debtors' Post-Trial Reply 7–8.
[113] Id.
[114] Memorandum Order Granting Motion to Strike [D.I. 235].

CERCLA claims are not subject to the discharge provisions in the Confirmation

Order.

> B. <u>MFT was an unknown creditor and, therefore, entitled only to publication notice, which the Debtors properly provided through publication of the bar date in *USA Today*.</u>

>> 1. <u>MFT was not a known creditor because, although a thorough review of Weiand's books and records would have revealed that MFT was a reasonably foreseeable creditor, such a review would not reveal that MFT was a reasonably *ascertainable* creditor.</u>

Under 11 U.S.C. § 523(a)(3)(A), a bankruptcy plan may discharge a creditor's

claim if the creditor "had notice or actual knowledge of the case in time for…timely

filing."[115] This code section is effectuated through Bankruptcy Rule 3003(c), which

requires that such chapter 11 creditors file proofs of claim prior to the court-

established bar date so they can participate in the reorganization.[116] Once the bar

date passes, a creditor, or "claimant," who does not file a timely proof of claim

cannot participate in the reorganization and the claim is discharged unless the

claimant establishes adequate grounds for why she failed to file a timely proof of

claim.[117]

Among the grounds sufficient to except creditors with late proofs of claim

from discharge is that the notice provided to them was inadequate.[118] The Supreme

Court, in <u>Mullane v. Cent. Hanover Bank & Trust Co.,</u> held that due process

---

[115] 11 U.S.C. § 523(a)(3)(A).

[116] Fed. R. Bankr. P. § 3003(c).

[117] <u>Id.</u> § 3003(c).

[118] <u>Mullane v. Cent. Hanover Bank & Tr. Co.,</u> 339 U.S. 306, 314 (1950).

requires that, for notice to be adequate, it must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency" of the proceeding.[119]

In bankruptcy proceedings, the level of notice required by due process turns on whether the creditor in question is "known" or "unknown" at the time of the bankruptcy court's order. "Known" creditors are entitled to actual notice of the proceedings, whereas, for unknown creditors, publication notice is often sufficient.[120] If notice is not adequately tailored to the status of the creditor and is thus insufficient, the creditor may proceed with their claim, despite its untimeliness.[121]

A creditor is "known" when their identity is either known or "reasonably ascertainable by the debtor."[122] An unknown creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]."[123]

A creditor's identity is "reasonably ascertainable" when the debtor can identify the creditor through "reasonably diligent efforts."[124] Such efforts do not require "impracticable and extended searches…in the name of due process."[125] Due

---

[119] Id.
[120] City of New York v. N.Y., N.H. & H.R. Co., 344 U.S. 293, 295–97 (1953); Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d. Cir. 1995).
[121] Chemetron, 72 F.3d at 346.
[122] Id. (internal quotations omitted).
[123] Mullane, 339 U.S. at 317.
[124] Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 n. 4 (1983).
[125] Mullane, 339 U.S. at 317–318.

process does not require an open-ended investigation, but, rather, it requires only that the debtor "careful[ly] examine[]…[its books and records]."[126]

This "reasonably ascertainable" standard is not to be confused with a standard of reasonable foreseeability. For a creditor to be reasonably ascertainable, other circuits have held that the debtor must, at a minimum, possess "'specific information' about a manifested injury[] to make the claim more than merely foreseeable."[127] "[I]n order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable."[128]

Reasonable foreseeability determines "which persons are entitled to receive notice" whereas the reasonably ascertainable test determines the "type of notice these persons are entitled to receive."[129] Thus, all creditors, known or unknown, are reasonably foreseeable, but it is only known creditors who are reasonably ascertainable through a careful review of the debtor's books and records.[130]

Mr. Trussell, in his declaration, asserts that the Debtors consulted with advisors to identify categories of potential creditors and, throughout this consultation, carefully considered litigation and potential environmental claims.[131]

---

[126] Chemetron, 72 F.3d at 347.
[127] In re Placid Oil Co., 753 F.3d 151, 156 (5th Cir. 2014).
[128] Matter of Crystal Oil, 158 F.3d 291, 297 (5th Cir. 1998).
[129] Chemetron, 72 F.3d at 351 (Sarokin, J., concurring).
[130] Id. at 348.
[131] Trussell Decl. ¶¶ 8–9.

However, during his testimony at trial, he revealed that he did not receive or review any files related to the Union Pacific Litigation.[132]

Had he reviewed files related to the Union Pacific Litigation, Mr. Trussell would have likely discovered the settlement between the Debtors and Union Pacific which protects the Debtors from "contribution, equitable comparative contribution, [and] partial or comparative indemnity [claims]" relating to the Taylor Yard.[133] Both the settlement motion and settlement order included service lists with the address for Mr. Mehrabian and his wife, Armenouri Mehrabian, in their individual capacities and as trustees of MFT.[134]

Prior to the settlement between the parties in that litigation, the Debtors filed a Third-Party Complaint against MFT, but, upon entry into the settlement, the Debtors abandoned the Third-Party Complaint without ever serving it on MFT.[135] The Plaintiffs contend that, had the Debtors reviewed these files related to the Union Pacific litigation, they would have discovered that, at the time of that litigation, Weiand did know that the Plaintiffs could have contamination claims against the Debtors because the files demonstrate the Debtor's understanding that adjacent property owners can have direct claims against their neighbors due to migration of contamination.[136] Thus, according to the Plaintiffs, even though such direct claims were not at issue nor even mentioned in the Union Pacific Litigation,

---

[132] Jan. 15 Tr. 114:22–115:21.
[133] Joint Ex. 6A, at 007.
[134] Joint Ex. 6A; Joint Ex. 6B.
[135] Joint Ex. 6A; Joint Ex. 6B.
[136] MFT Post-Trial Br. 31–33.

that MFT was brought in through the Third-Party Complaint for contribution at all reveals that the Debtors should have ascertained that MFT was a potential claimant and thus a known creditor.

However, the Union Pacific Litigation files do not reveal any information to suggest that MFT had a claim against the Debtors; instead, the Debtors filed the Third-Party Complaint against MFT for contribution claims.[137] While MFT is, of course, the subject of the Third-Party Complaint and mentioned in the Service List of the Settlement Motion and Order, nothing in the Union Pacific Litigation would suggest that MFT might have a claim against the Debtors.[138] Yes, these files would have revealed that the Debtors, during this litigation, understood that a property owner would owe cleanup costs to adjacent property owners when contamination travels from one property to another, but nowhere in these litigation files is the allegation or even the suggestion that there was such contamination travelling from the Weiand Site onto the MFT Property.

Thus, though Mr. Trussell did not review the Union Pacific Litigation files, had there been a careful review of those files, it would not have revealed MFT as a reasonably ascertainable creditor, regardless. The Mehrabians' names and addresses appearing in the service list and their inclusion in the Third-Party Complaint do make MFT a reasonably foreseeable creditor but are not enough to make MFT reasonably ascertainable.[139] Therefore, because a careful review would

---

[137] Joint Ex. 6B.
[138] Id.
[139] Id.

28

not have revealed MFT as a known creditor, MFT cannot be said to be one. MFT is then an unknown creditor entitled only to publication notice.

>   2. Publication of the bar date in *USA Today* was constitutionally adequate to provide unknown creditors like MFT with notice.

"[W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."[140] Publication notice is not a reliable mean to inform known creditors of bankruptcy proceedings.[141] However, when the creditor in question is unknown, publication notice may be sufficient so long as it is reasonably calculated under the circumstances to inform parties of the bankruptcy proceedings.[142]

In Chemetron Corp. v. Jones, the Third Circuit noted "it is well established that, in providing notice to unknown creditors, constructive notice of the bar claims date by publication satisfies the requirements of due process."[143] The court there further opined that it had "little difficulty holding that the notice which Chemetron published in the *New York Times* and the *Wall Street Journal* was sufficient."[144]

MFT argues that publication notice in a single publication like *USA Today* is inadequately tailored to the needs of unknown creditors and cites caselaw

---

[140] Mullane, 339 U.S. at 315.
[141] Id.
[142] Id. at 314.
[143] Chemetron, 72 F.3d at 348.
[144] Id.

supporting this proposition.[145] However, even the cases it cites would seem to

disagree. The Bankruptcy Court for the Southern District of Texas, in <u>In re Buttes</u>

<u>Gas & Oil Co.</u>, found that publication notice in the *International Herald Tribune*, an

international paper, was insufficient notice, but, in doing so, directly contrasted

that publication with the *New York Times* and *Wall Street Journal*.[146] While the

*International Herald Tribune* had a relatively small circulation and would not be

expected to reach many Americans plaintiffs, the court there noted that "publication

in a newspaper or journal that will be received across the US, such as the *Wall*

*Street Journal* or the *New York Times*…is generally understood to be sufficient

notice to unknown creditors."[147]

　　Further, though there is case law to suggest that some courts might prefer

publication notice in a nationally syndicated newspaper to be supplemented with

notice in local publications, there is nothing constitutionally requiring such

supplementation.[148] Publication in a nationally syndicated newspaper is, by itself,

enough to meet the constitution's notice requirements for unknown creditors.[149]

*USA Today* was the nation's largest selling daily print newspaper in 2009, and this

---

[145] <u>Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd. (In re Buttes Gas &</u>
<u>Oil Co.)</u>, 182 B.R. 493 (Bankr. S.D. Tex. 1994).
[146] <u>Id.</u> at 497.
[147] <u>Id.</u>
[148] <u>See</u> <u>Wright v. Owens Corning</u>, 679 F.3d at 107–08 (citing <u>Chemetron Corp. v.</u>
<u>Jones</u>, 72 F.3d at 348–49 ) (explaining that while "notice by publication in national
newspapers is sufficient to satisfy the requirements of due process, particularly if it
is supplemented by notice in local papers," this supplementation is not a
constitutional requirement).
[149] <u>Wright v. Owens Corning</u>, 679 F.3d at 108.

Court has previously held numerous times that publication solely in the national edition of *USA Today* is sufficient and constitutionally adequate notice for unknown creditors.[150]

Therefore, the Debtor's publication notice of the bar date in *USA Today* was constitutionally adequate and reasonably calculated to reach unknown creditors.

IV.    <u>Conclusion</u>

In sum, the CERCLA claims accrued post-petition because the evidentiary record does not support the finding that MFT incurred any "response costs" prepetition or pre-confirmation. Therefore, the CERCLA claims are not subject to the discharge provisions in the Confirmation Order, and the Plaintiffs may pursue these claims in the California Action.

However, the California state law claims did accrue prepetition because the Plaintiffs knew or reasonably should have known that the PCE contamination might have migrated to the MFT Property. Because they should have known, they then should have investigated this potential migration and, had they investigated, they would have discovered, based on the evidence available to the Court, that contamination had migrated onto the MFT Property prior to the petition date. Therefore, the California state law claims did accrue prepetition, meaning that the Confirmation Order did discharge them, so long as notice was properly given to the Plaintiffs.

---

[150] Debtors' Pretrial Br. 46.

Although MFT might have been a reasonably foreseeable creditor based on a thorough review of the Debtors' books and records, it was not a reasonably ascertainable one. MFT was then merely an unknown creditor entitled only to publication notice. The Debtors' publication of the bar date in *USA Today* satisfied the constitutional notice requirements for such unknown creditors, and, thus, notice was properly given.

In conclusion, the CERCLA claims accrued post-confirmation, and they may thus be pursued in the California Action. However, the California state law claims accrued prepetition and constitutionally adequate notice was given, so the Confirmation Order did discharge them, meaning they may not be further pursued in the California Action.

The parties are directed to settle an appropriate form of order and submit that order under certification of counsel.

Dated: October 2, 2025
Wilmington, Delaware

_____
Thomas M. Horan
United States Bankruptcy Judge